JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a minor and Lillie Mae Stubbs

**DEFENDANTS**

Officer Dwayne Merrell, Badge #7078 and City of Philadelphia

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
            THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
THOMAS R. KLINE / TRACIE L. PALMER / PRISCILLA E. JIMENEZ
KLINE & SPECTER, P.C. / 1525 LOCUST STREET, PHILA PA 19102
215-772-1384

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec 1331 and 42 U.S.C. Sec 1983

Brief description of cause:
State created danger claim under Section 1983

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   150,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE
07/25/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LYESHA CLARK, Individually, and<br>as Parent and Natural Guardian of<br>Z.C., a minor<br>1110 W. Lehigh Avenue<br>3rd Floor<br>Philadelphia, Pennsylvania 19133<br><br>    and<br><br>LILLIE MAE STUBBS<br>2734 Preston Drive<br>Decatur, Georgia 30034<br><br>              Plaintiffs,<br><br>    v.<br><br>OFFICER DWAYNE MERRELL<br>Badge #7078 c/o CITY OF PHILADELPHIA<br>POLICE DEPARTMENT, Individually and in<br>his Official Capacity<br>16th Police District<br>3900 Lancaster Avenue<br>Philadelphia, Pennsylvania 19104<br><br>    and<br><br>CITY OF PHILADELPHIA<br>c/o City Solicitor's Office<br>1600 Arch Street<br>Philadelphia, Pennsylvania 19103<br><br>              Defendants. | **FILED PURSUANT TO<br>28 U.S.C. §§ 1331, 1391 AND<br>LOCAL CIVIL RULE 5.1.2**<br><br>CIVIL ACTION NO. 2:19-cv-01579-RBS<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

    Plaintiffs, Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a minor, and Lillie Mae Stubbs, by and through their attorneys, Kline & Specter, P.C., allege as follows:

## PARTIES

1.  Plaintiff, Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a Minor ("Clark"), is an adult citizen and resident of the state of Pennsylvania, residing at 1110 W. Lehigh Avenue, 3rd Floor, Philadelphia, Pennsylvania.

2.  Minor-plaintiff, Z.C. ("Minor-Plaintiff Z.C."), is a minor and resident of the state of Pennsylvania, residing at 1110 W. Lehigh Avenue, 3rd Floor, Philadelphia, Pennsylvania.

3.  Plaintiff, Lillie Mae Stubbs ("Plaintiff Stubbs") is an adult citizen and resident of the state of Georgia, residing at 2734 Preston Drive, Decatur, Georgia 30034.

4.  Defendant, Dwayne Merrell ("Defendant Merrell"), is an adult individual and police officer with the City of Philadelphia Police Department in the state of Pennsylvania, organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at the 16th Police District, 3900 Lancaster Avenue, Philadelphia, Pennsylvania. At all times relevant hereto, Officer Dwayne Merrell was a Philadelphia police officer assigned to the 16th Police District.  Plaintiffs are asserting claims against Officer Dwayne Merrell in his individual capacity.

5.  Defendant, City of Philadelphia ("City"), is a city, political subdivision, governmental entity and municipality in the Commonwealth of Pennsylvania, organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at City Hall, c/o City Solicitor's Office, 1600 Arch Street, Philadelphia, Pennsylvania 19103.

6.  At all times material hereto, Defendant, City of Philadelphia, has owned, operated, maintained, was responsible for, and/or otherwise controlled the 16th Police District.

7.  At all times material hereto, Defendant, City of Philadelphia, provided police services to the City and County of Philadelphia.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims arise under The Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants can be found in, reside, or transact business in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claim occurred in this District.

## MATERIAL FACTS

11.     On April 15, 2017, Defendant Merrell was on duty as a Philadelphia Police Officer.

12.     Defendant Merrell was assigned to All Terrain Vehicle (ATV) Enforcement Detail, a special detail to confiscate dirt bikes and ATVs operated on the streets of Philadelphia.  As part of his assigned detail, Defendant Merrell was operating a marked police motorcycle.

13.     Roll call was held at the beginning of the ATV detail, at which time Defendant Merrell's supervisors, Lt. Ruff and Lt. Frisco, repeatedly emphasized to members of the detail, including Merrell, that there were to be no pursuits of ATVs/dirt bike riders during the detail.  The goal of the detail was to confiscate ATVs not to make apprehensions.  See Internal Investigation IAD# 17-1059 Memorandum at pp. 6, 10 attached hereto as Exh. "A."

14.     During roll call, Lt. Ruff and Lt. Frisco handed out copies of the Philadelphia Police Directive regarding vehicular pursuits, including the pursuit of ATVs, to members of the detail, including Defendant Merrell.  Id.

15.     According to Lt. Frisco, members of the detail, including Defendant Merrell, were told that they were not to pursue any vehicle during the detail short of witnessing a violent felony. See Exh. "A" at p. 16.

16.     Philadelphia Police directive 9.4 addresses vehicular pursuits and prohibits high speed vehicular chases except in limited circumstances.   The directive states as follows:

An officer is justified in initiating a vehicular pursuit only when they are:

a. In close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or

b. In close proximity to a suspect vehicle and believes BOTH:

1) The pursuit is necessary to effect the arrest or prevent escape, AND;
2) The officer has probable cause to believe that the person being pursued has committed or attempted a forcible felony OR, has probable cause to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.

In all other circumstances initiating a vehicular pursuit is strictly prohibited.   Accordingly, **initiating a pursuit solely for stolen vehicles and traffic violations, including Driving Under the Influence (DUI), is strictly prohibited**.

See Directive 9.4, attached hereto as Exhibit "B" (emphasis added).

17.     Directive 9.4 also provides that "sworn personnel in fresh and continuous pursuit may NOT pursue outside of the boundaries of Philadelphia unless permission is granted by a higher-ranking supervisor." See Exhibit "B."

18.     On April 15, 2017, Caliph Rashaad Douglass ("Douglass") was operating a green and white motorcycle on the streets of Philadelphia.

4

19.     While on duty as a member of the ATV detail, Defendant Merrell observed Douglass operating the green and white motorcycle.  Defendant Merrell attempted to initiate a vehicle stop of Douglass by activating his lights and sirens near 5400 Willows Avenue in Philadelphia.

20.     Douglass did not stop his vehicle and left the area.  In response, Defendant Merrell gave chase on his police motorcycle in direct violation of Directive 9.4 and the orders of his supervisors.  See Exh. "A" at p. 12.

21.     At the time Defendant Merrell initiated pursuit, Douglass had not committed any non-traffic violation or crime to justify a vehicular pursuit under Directive 9.4 and the orders of Defendant Merrell's supervisors.  See Exh. "A" at p. 15.

22.     Defendant Merrell's pursuit resulted in a high-speed chase that crossed city lines into Upper Darby, Pennsylvania, including through Cobbs Creek Park and the 69th Street Transportation Center, and other areas densely populated with pedestrians, in violation of Directive 9.4 and the orders of Defendant Merrell's supervisors and in conscious disregard and deliberate indifference to the safety of pedestrians and others.

23.     Defendant Merrell admits that pursuit speeds may have reached 60mph in violation of Directive 9.4 and the orders of Defendant Merrell's supervisors and in conscious disregard and deliberate indifference to the safety of pedestrians and others.  Id. at p. 12.

24.     Defendant Merrell admits that the pursuit lasted approximately eight to ten minutes and covered a distance of six to seven miles through various parts of Southwest Philadelphia and into Upper Darby, Pennsylvania in violation of Directive 9.4 and the orders of Defendant Merrell's supervisors and in conscious disregard and deliberate indifference to the safety of pedestrians and others.  Id. at p. 13, 15.

5

25.    Defendant Merrell pursued Douglass across city lines into Upper Darby in violation of Directive 9.4.  Defendant Merrell did not have permission from a higher-ranking supervisor to pursue Douglass outside of Philadelphia into Upper Darby.  In fact, his supervisors, Lt. Ruff and Lt. Frisco, were unaware that Defendant Merrell had crossed into Upper Darby until contacted by Upper Darby Police. Id. at p. 15.

26.    On April 15, 2017, at or around 1:27pm, Plaintiff Stubbs and her niece, minor-Plaintiff Z.C., were crossing 69th Street near the 69th Street Transportation Center in Upper Darby, Pennsylvania in the clearly designated pedestrian crosswalk.  At that time, Douglass was traveling northbound on 69th Street while being pursued by Defendant Merrell.

27.    Douglass struck Plaintiff Stubbs and minor-Plaintiff Z.C., throwing them approximately 42 feet from the point of contact.  Both Plaintiff Stubbs and minor-Plaintiff Z.C. lost consciousness and sustained serious injuries from which they continue to suffer to this day.

28.    As part of the Internal Affairs Bureau (IAB) investigation of the incident, a Philadelphia Police Radio audio reproduction of the police radio band used by the ATV detail (Special Events 1) was created and reveals the following events as broadcast over Special Events 1 on April 15, 2017:

**INVESTIGATIVE ANALYSIS:**

On 4-15-17, P/O Dwayne Merrell #7078 responded to the UDPD and provided a witness statement to the assigned UDPD investigators, as well as detailing the route he traveled through Upper Darby while in pursuit of the green and white motorcycle.

A Philadelphia Police Radio audio reproduction of Special Events 1 band on 4-15-17, was obtained and has been added to this investigation. The audio reproduction contains the following in relation to the pursuit of the green and white motorcycle:

1:05:08 PM, 12E broadcasted a green and white motorcycle, with a black male operator wearing a red hooded sweatshirt, in the area of Allison St. and Vodges St.

1:06:22, 12E broadcasted that the green and white motorcycle was traveling northbound on 55th St. from Springfield Ave. and then eastbound on Windsor Ave. from 55th St.

1:08:02, 12E broadcasted that the green and white motorcycle was traveling northbound on 55th St. from Florence Ave.

1:08:24, 12E broadcasted that the green and white motorcycle was traveling eastbound on Willows from 55th St.

1:08:45, 12E broadcasted the motorcycle was lost in the area, last seen eastbound on Willows from 55th St., possibly in the driveways.

1:17:36, UCBD1 spotted the green and white motorcycle traveling southbound on 52nd St. from Baltimore Ave., then westbound on Baltimore Ave.

1:18:50, "M1" broadcasted that the green and white motorcycle was at 52nd and Warrington (16M-2 broadcasted with sirens audible). BD1 "westbound on Malcolm from 55th."

1:20:01, Radio "key ups" "northbound on Cobbs Creek" "59 and Cobbs" "going into the woods." Dispatcher asks who is out there; 16M-2 broadcasted that it was him.

1:20:49, Several radio "key ups" with sirens in the background – unintelligible broadcasts – 16M-2 "northbound on Cobbs from (or Christian St.), 6100 Chestnut St." Radio "key ups" and unintelligible transmissions followed by "Christian." Radio attempted to confirm the location by

2

CITY 002

asking, "Cobbs Creek and Christian?" Radio attempted to raise 16M-2, followed by "6100 Chestnut."

1:23:32, 16M-2, "Southbound 60th from Locust…eastbound Spruce. 12E broadcasted, "We are not pursuing this dirt bike through the city here, let's try to get a last location and try to box him in." Police Radio acknowledges 12E and attempts to raise 16M-2 for acknowledgement. 16M-2 replied, "Southbound 60 – last seen."

1:26:53, 12M1 asked for the last location of 16M-2. Police Radio advised 12M1 "last location 60th and Spruce" followed by inaudible transmissions.

1:29:04, 12M1 requested 16M-2's location again. An unknown person responded, "63 and Market."

1:29:59, Philadelphia Police Radio received a phone call from an unknown caller reporting a car that had gone into the woods and a male fled the car at Park Ave. and Market St. in Millbourne.

1:31:20, 12X broadcasted, "Any of my units know if they see anything, let's just try to get a location before we try and go after it. I know it's tough, we're sharing air too, let's try to get them down here before the guy takes off."

1:39:32, Upper Darby Police Radio called the Philadelphia Police Radio room and asked if a pursuit from Philadelphia came into Delaware County.

1:44:04, Upper Darby Police Radio called the Philadelphia Police Radio room and requested that a Philadelphia Police commander respond to 69th Street, at the Tower Theater, to meet Upper Darby Police personnel.

<u>See</u> Exh. "A" at pp. 2-3.

29.     During the ATV detail, Defendant Merrell was using the call sign 16M-2 to identify himself over police radio.  Lt. Ruff's call sign was 12-X and Lt. Frisco's call sign was 12-E.  <u>See</u> Exh. "A" at pp. 1, 6, 10.

30.     As detailed in the radio transmissions above, at 1:23:32 hours, Lt. Frisco instructs Defendant Merrell over police radio: "We are not pursuing this dirt bike [the green and white motorcycle operated by Douglass] through the city here . . . ." <u>Id.</u> at p. 3.

31.     Following Lt. Frisco's broadcast, Police Radio attempted to elicit acknowledgement from Defendant Merrell.  Instead, Defendant Merrell continued to broadcast his changing location in pursuit of Douglass in violation of Directive 9.4 and the orders of his supervisors and in conscious disregard and deliberate indifference to the safety of pedestrians and others. <u>Id.</u>

32.     Lt. Ruff informed IAB that he believed Defendant Merrell did acknowledge Lt. Frisco's broadcast ordering Defendant Merrell not to pursue Douglass.  Nonetheless, Defendant Merrell continued to pursue Douglass in violation of Directive 9.4 and the orders of his supervisors and in conscious disregard and deliberate indifference to the safety of pedestrians and others. <u>Id.</u> at p. 7.

33.     Lt. Ruff heard Defendant Merrell's siren over police radio as Defendant Merrell transmitted his location during his pursuit of Douglass on the green and white motorcycle. <u>Id.</u> at pp. 6-7.

34.     Charles Paris was interviewed by IAB investigators and stated that he observed a male on a motorcycle pass his location at 25 Oak Ave., East Lansdowne, Pennsylvania at approximately 1:25pm at a high rate of speed followed by a police officer operating a motorcycle

at a high rate of speed with the siren activated. Mr. Paris also stated there had been a lot of pedestrian and vehicle traffic at the time. Id. at p. 5.

35. A compilation of surveillance camera footage obtained by members of the Upper Darby Police Department tracks Defendant Merrell's pursuit of Douglass from the area of 6200 Baltimore Pike in Philadelphia to 6400 Market Street in Upper Darby:

> On 4-20-17, Lt. Clough was provided a DVD that contained a compilation of surveillance camera footage obtained by members of the UDPD. The various surveillance recordings show the green and white motorcycle, with a black male wearing a red hooded sweatshirt, being pursued by a Philadelphia Police officer operating a marked police motorcycle. It should be noted that the video recordings are from various sources/locations in Upper Darby, PA. The video compilation shows the continuous progression of the pursuit beginning in the area of 6200 Baltimore Pike and the final video is from 6400 Market St. It should also be noted that any time stampings seen on the videos may not be accurate since they were obtained from various locations and are presumably not synched in any manner.
>
> - At an unknown time (no timestamp on video) the video begins in the area of Baltimore Pike near Church Lane in Upper Darby Twp. PA. P/O Merrell is observed in close pursuit of the green and white motorcycle traveling westbound on Baltimore Pike.
>
> - 13:33:02, the pursuit is seen northbound on Church Ln. and eventually onto northbound 69th St.
>
> - 13:27:19, the green and white motorcycle is observed on the unit block of 69th St. traveling northbound. This view is from the UDPD mini-station (camera facing south/southeast).

3

CITY 002

9

- 13:27:32, P/O Merrell is observed on the unit block of 69th St. traveling northbound. This view is from the UDPD mini-station (camera facing south/southeast).

- 13:27:22, the green and white motorcycle is seen striking the pedestrians. The operator (wearing a red hooded sweatshirt) is seen running from the scene northbound on 69th St. This view is from the UDPD mini-station (camera facing north/northeast).

- 13:27:48, P/O Merrell passes the collision scene. This view is from the UDPD mini-station (camera facing north/northeast).

- 13:27:55, A camera at 69th St. and Market St. recorded the male in the red hooded sweatshirt operating a dark Nissan turning eastbound onto Market St. (camera is facing south).

- 13:27:57, a camera at 69th St. and Market St. recorded P/O Merrell turning eastbound onto Market St. following the stolen Nissan closely (camera is facing south).

- 13:27: (no seconds), the stolen Nissan and P/O Merrell are seen traveling eastbound on Market St. (camera facing eastbound).

- 13:28: (no seconds), P/O Merrell is seen pursuing the stolen Nissan eastbound on Market St. P/O Merrell is seen with his emergency lights off for a period of approximately 5.5 seconds. After the 5.5 seconds, P/O Merrell's emergency lights are back on as he continued pursuing the stolen Nissan.

- 13:28:26, the stolen Nissan is seen entering a lot in the 6300 block of Market St. where the driver abandons the Nissan.

- 13:28:47, P/O Merrell is seen traveling eastbound on Market St., in what appears to be a non-emergency speed (no emergency lights appear to be activated) passing the lot where the Nissan was abandoned.

- 13:28:52, P/O Merrell is last observed traveling eastbound on 6300 Market St. nearing the city boundary.

See Exh. "A" at pp. 3-4.[1]

36.    According to time-stamped video obtained by Upper Darby police, as detailed above, Defendant Merrell traveled through the pedestrian crosswalk at the 69th Street Transportation Center approximately 26 seconds after Douglass made impact with Plaintiff and minor-Plaintiff.[2]

37.    Video surveillance demonstrates that Defendant Merrell drove his police motorcycle past where Plaintiff Stubbs and minor-Plaintiff Z.C. lay wounded and continued his pursuit of Douglass.

---

[1] According to the IAB investigation memorandum, "It should be noted that the video recordings are from various sources/locations in Upper Darby, PA. . . . It should also be noted that any time stampings seen on the videos may not be accurate since they were obtained from various locations and are presumably not synched in any manner." See Exh. "A" at p. 3.

[2] Video surveillance time stamps may not be accurate. See infra at fn.1.

38.     According to Philadelphia Police Directive 4.1, a police officer on the scene will protect the scene and summon necessary assistance and render first aid to the injured. See Id. at p. 16.

39.     Defendant Merrell failed to stop and render aid to Plaintiff or minor-Plaintiff; failed to notify emergency services of injured persons in need of immediate medical attention; failed to notify Upper Darby Police about the incident or to request additional assistance; and failed to secure the scene of the incident, all in violation of Philadelphia Police policy.

40.     According to the IAB investigation memorandum:



Although P/O Merrell was a short distance away when the collision occurred, P/O Merrell drove his police motorcycle right past the scene of the collision and continued to travel northbound on 69th Street in the same direction as the male fleeing on foot. P/O Merrell made no efforts to render, nor summons medical aid for the victims. P/O Merrell took no initiative to protect the crime scene, nor did he request assistance from any emergency services personnel, regardless of what jurisdiction he believed he had been in. At the conclusion of P/O Merrell's pursuits, he simply returned to his normal patrol duties in the City of Philadelphia and did not report any of the unusual circumstances to anyone, including Upper Darby Township emergency personnel.

Id. at p. 17.

41.     As described above, following impact with Plaintiff and minor-Plaintiff, Douglass was separated from the green and white motorcycle and fled on foot.  Douglass is later captured on video surveillance operating a dark color Nissan, followed closely by Defendant Merrell who intermittently activated his lights and sirens in pursuit of the Nissan. Id. at pp. 3-4, 17.

42.     Defendant Merrell pursued the Nissan for several blocks until Douglass abandoned the Nissan in a lot near 6300 Market Street and fled on foot.  Defendant Merrell is seen passing the lot where the Nissan was abandoned at a non-emergency speed, after which time he crossed back into Philadelphia and resumed his patrol without notifying his supervisors, police radio or

Upper Darby police about the events that had transpired or emergency services regarding Plaintiff and minor-Plaintiff. Id. at pp. 3-4, 1-18.

43.     Accordingly, Defendant Merrell engaged in a second unauthorized police pursuit outside of Philadelphia in violation of Philadelphia Police policy, and unbeknownst to either Philadelphia or Upper Darby police.

44.     After being contacted by Upper Darby police regarding the vehicular pursuits and injuries suffered by Plaintiff and minor-Plaintiff, Lt. Ruff and Lt. Frisco each confronted Defendant Merrell about the pursuit.  Defendant Merrell baldly and repeatedly lied about his actions, including that he pursued Douglass on the green and white motorcycle; that he witnessed the collision with Plaintiff and minor-Plaintiff; and that he pursued the dark color Nissan.

45.     According to Lt. Ruff:

> with Lt. Frisco. Lt. Ruff confronted P/O Merrell and asked him what happened.  P/O Merrell told Lt. Ruff that he had seen the motorcycle go into the park at Cobbs Creek, onto the trails and P/O Merrell attempted to stop him.  P/O Merrell told Lt. Ruff he could barely see the motorcycle due to a dust cloud.  P/O Merrell told Lt. Ruff that he did not transmit over radio because he did not know where he was at.  According to Lt. Ruff, P/O Merrell told him that at one point the green and white motorcycle may have stalled and P/O Merrell ran up to the motorcycle.  The male was able to restart the motorcycle and P/O Merrell ran back to his motorcycle with the siren still on.  The male on the motorcycle fled once again.
>
> According to Lt. Ruff, P/O Merrell told him that he had exited the back of the woods onto a street that P/O Merrell knew was not in Philadelphia and P/O Merrell had seen the male two blocks ahead of him.  Lt. Ruff stated that P/O Merrell told him that he knew he was out of the city and he was not supposed to be pursuing, so he stopped following the motorcycle and tried to find his way back into the city.
>
> Lt. Ruff stated he told P/O Merrell that he thought that P/O Merrell had been fighting with someone because he could not hear him and Lt. Ruff has experienced officers leaving their sirens on when in need of assistance.  P/O Merrell told Lt. Ruff that there had been a problem with his radio.  Lt. Ruff asked P/O Merrell if he had lost the motorcycle, why did he continue to hear his siren over the radio.  P/O Merrell told Lt. Ruff that he had gotten lost in Upper Darby.  Lt. Ruff asked P/O Merrell if he had been in a pursuit; P/O Merrell replied, "No."
>
> P/O Merrell told Lt. Ruff that he had followed the green and white motorcycle into the park and came out of the park on the Upper Darby side and could not see the motorcycle after that.  Lt. Ruff stated that he was not sure if he believed P/O Merrell's story at that point because he felt that P/O Merrell may not be relating the entire story.

7

CITY 007

12

Lt. Ruff asked P/O Merrell if he had told him everything and P/O Merrell said, "Yes." Lt. Ruff asked P/O Merrell to simply tell him if there had been a pursuit. P/O Merrell assured Lt. Ruff that he had not been in a pursuit. As Lt. Ruff was going to investigate P/O Merrell's story, Lt. Ruff received a phone call from Lt. Hayes from the 24th District (Lt. Hayes was the lieutenant working the ATV detail in ROC North) and Lt. Ruff was asked to call the Police Radio room. Lt. Ruff had called Philadelphia Police Radio and was asked to contact Delaware County. Lt. Ruff responded to 69th St. in Upper Darby.

Lt. Ruff responded to 69th St. in Upper Darby and saw a large scene. Upper Darby police told Lt. Ruff that the information they received was that a Philadelphia Police Officer on a dirt bike had chased a green and white dirt bike. The green and white dirt bike was being chased by the Philadelphia Police dirt bike and the green and white dirt bike struck a lady and a girl crossing 69th St. Lt. Ruff was told that the Philadelphia Police motorcycle officer drove past the accident scene, northbound on 69th St. and turned right onto Market St. Lt. Ruff called Lt. Frisco and told him to speak with P/O Merrell again and for P/O Merrell to be truthful. Lt. Ruff instructed Lt. Frisco to take P/O Merrell into the 12th District and prepare a pursuit memorandum.

Lt. Ruff stated that Lt. Frisco told him that P/O Merrell had admitted to chasing the dirt bike into Upper Darby, but he denied seeing an accident or victims. Lt. Ruff said that later in the day, P/O Merrell admitted that he had pursued the dirt bike into Upper Darby, although P/O Merrell once again denied that he had seen the accident or the victims. Lt. Ruff stated that P/O Merrell denied that he saw the carjacking, or pursued the carjacked vehicle.

Id. at pp. 7-8.[3]

46.    According to Lt. Frisco:

Lt. Frisco later located P/O Merrell at Cobbs Creek Pkwy. and Springfield Ave. Lt. Frisco asked P/O Merrell about the incident that he believed had been a foot pursuit or a fight. According to Lt. Frisco, P/O Merrell told him that the dirt bike had pulled into a wooded area of the park and P/O Merrell had lost sight of the dirt bike. P/O Merrell told Lt. Frisco that after losing sight of the dirt bike in the wooded area, he rode out of the park. P/O Merrell also told Lt. Frisco that he saw the dirt bike in the distance and tried to give the best location available. P/O Merrell told Lt. Frisco that he had never gotten close enough to initiate a traffic stop. When Lt. Frisco asked P/O Merrell about the garbled radio transmissions, P/O Merrell told Lt. Frisco that his headset was not compatible with the newly issued portable radio. Lt. Frisco stated he had asked P/O Merrell if he had chased the dirt bike and P/O Merrell said, "No." Lt. Frisco had no reason to not believe P/O Merrell at that time. When asked by Lt. Frisco, P/O Merrell denied that he ever pursued, or initiated a traffic stop of the green and white motorcycle at any time. Lt. Frisco stated P/O Merrell made no mention of the carjacking at 69th St. and Market St., or a pursuit of the carjacked vehicle.

Within an hour after speaking to P/O Merrell at Cobbs Creek Pkwy and Springfield Ave., Lt. Frisco received a call from Lt. Ruff who told him that he was asked to respond to 69th St. near the SEPTA terminal in Upper Darby in reference to a Philadelphia Police dirt bike possibly having been involved in a pursuit in Upper Darby. The pursuit ended with several pedestrians being struck and a carjacking. Lt. Frisco had all the dirt bikes assigned to the ATV detail meet him at a location in the 19th District. Lt. Frisco addressed the entire group and told them what information he had at that time. Lt. Frisco asked the group if anyone wanted to come clean, that this was the time. P/O Merrell raised his hand and said that he had chased a dirt bike through Upper Darby.

P/O Merrell told Lt. Frisco that he had spotted the dirt bike a few minutes after Lt. Frisco went over the air and said not to pursue the dirt bike. According to Lt. Frisco, P/O Merrell told him that he had chased the dirt bike through the park, into Upper Darby, and north on 69th St. and he returned to the city. P/O Merrell denied that he had seen a crash or a carjacking. Lt. Frisco ordered P/O Merrell to accompany him to the 12th District to prepare pursuit paperwork.

Id. at p. 11.

_____

[3] During his IAB interview, Defendant Merrell admitted that he had inspected his radio and emergency equipment at the beginning of the detail and believe all his equipment worked properly. See Exh. "A" at p. 11.

13

47.     Defendant Merrell ultimately confessed to the initial pursuit of Douglass on the green and white motorcycle only after confronted by his supervisors, after which time he filled out Philadelphia Police and Pennsylvania State Police pursuit memorandums.  In so doing, Defendant Merrell continued to lie about the incident, falsely claiming the pursuit lasted only eight city blocks and two minutes.  Defendant Merrell also omitted mention of the second pursuit of the dark colored Nissan and the collision with Plaintiff and minor-Plaintiff.  Defendant Merrell never amended this paperwork to correct his earlier falsifications and omissions.  Id. at pp. 12-13, 15-16.

48.     Later, when questioned by IAB, Defendant Merrell admitted that he did not report the initial pursuit of the green and white motorcycle to his supervisors until asked.  He also admitted that he did not report the second pursuit of the dark colored Nissan because he was fearful of getting into trouble.  Defendant Merrell continued to deny being aware of the collision with Plaintiff and minor-Plaintiff.  Id. at p. 12.

49.     According to the IAB investigators' conclusions:



Numerous video surveillance cameras that recorded portions of P/O Merrell pursuing the green and white motorcycle throughout Upper Darby, as well as the admissions during his Internal Affairs interview confirmed that portions of the information that P/O Merrell provided to his superiors were false and attempting to deceive.

50.     Defendant Merrell also stated to IAB investigators that he should not have pursued the green and white motorcycle and that his actions demonstrated a clear lack of judgement.  Defendant Merrell further admitted that pedestrians are in danger of being struck during a police vehicular pursuit.  Id. at p. 13.

51.     The IAB investigation concluded by sustaining the following violations against Defendant Merrell: 1) violations of Directive 9.4 concerning vehicular pursuits; 2) Falsification of

official documents (namely, the pursuit memoranda); 3) Insubordination (namely, directly disobeying Lt. Ruff's and Lt. Frisco's orders not to engage in vehicular pursuits); 4) violation of Directive 4.1 regarding the failure to render aid, call for assistance or secure the scene following the collision with and injury to Plaintiff and minor-Plaintiff; and 5) Providing False Statements to a supervisor (namely, the repeated lies to Lt. Ruff and Lt. Frisco about the unauthorized pursuits). Id. at pp. 15-17.

52.     The IAB investigation's finding that Defendant Merrell violated Directive 4.1 regarding the failure to render aid and secure the scene makes clear that investigators saw through Defendant Merrell's false claim (among many others) that he was unaware Plaintiff and minor-Plaintiff had been struck by Douglass.

53.     The IAB investigation further sustained allegations of Failure to Supervise against Lt. Ruff and Lt. Frisco because "review of the radio reproductions . . . clearly indicate that P/O Merrell had been pursuing the motorcycle and broadcasting some of his locations as he progressed. Lt. Frisco [and Lt. Ruff] failed to recognize the pursuit, and take proactive and authoritative measures to stop P/O Merrell from continuing the pursuit." Id. at pp. 18-19.

54.     A violation of Directive 9.4 was also sustained against Lt. Frisco for suggesting to Defendant Merrell during his initial pursuit of Douglass via police radio: "Let's try to get a last location and try to box him [Douglass] in." Boxing in is explicitly prohibited under Directive 9.4, which forbids stopping fleeing vehicles. Id. at p. 18.

55.     Violations of Directive 9.4 and Special Unit/District Special Operating Procedures were also sustained against police radio dispatch Officers Delgado and Mitchell for failing to recognize and acknowledge that Defendant Merrell was in pursuit of Douglass and take appropriate action, including asking the initiating officer if the vehicle is refusing to stop; the

15

reason for the pursuit; contacting a patrol supervisor immediately; and notifying a radio room supervisor immediately. Directive 9.4 also required Officers Delgado and Mitchell to notify "J" band of the pursuit; contact the initiating officer's direct supervisor; and notify the police aviation unit, none of which Officers Delgado and Mitchell did despite clear evidence via police radio that Defendant Merrell was in pursuit of Douglass on the green and white motorcycle. Id. at pp. 19-10.

56.     The IAB investigation concluded that "the result of the vehicular pursuit [by Defendant Merrell] was a collision between the fleeing motorcycle and two pedestrians in Upper Darby Township." Id. at p. 15.

57.     Following the incident, Plaintiff Stubbs was taken to Penn Presbyterian Hospital with head and extremity injuries. Minor-plaintiff Z.C. was taken to Children's Hospital of Philadelphia with head, neck and extremity issues where she was admitted to the intensive care unit and underwent emergent surgery. Plaintiff Stubbs and minor-Plaintiff Z.C. underwent extensive treatment for their respective injuries and each continues to suffer from these injuries and their sequalae.

58.     Based on the above, Defendant Merrell did not reasonably believe that pursuit of Douglass was necessary to prevent the death or serious bodily injury of another person.

59.     Based on the above, Defendant Merrell did not reasonably believe and did not possess information to support any such belief that Douglass had committed or attempted a forcible felony; that Douglass possessed a deadly weapon, other than the vehicle itself; or that pursuit of Douglass was necessary to effect his arrest or prevent escape.

60.     Defendant Merrell violated the Philadelphia Police Directive regarding vehicular pursuits and his supervisors' direct orders despite the great risk of death or serious bodily injury to the large number of pedestrians in the area, including Plaintiff Stubbs and minor-Plaintiff Z.C.

61.     Based on the above, Douglass' operation of a motorcycle was not an emergency and pursuit under the circumstances was strictly prohibited.  Accordingly, Defendant Merrell had time to consider whether to engage in an inherently risky pursuit.

62.     Nonetheless, Defendant Merrell acted with deliberate indifference and in conscious disregard to the great risk to the health and safety of pedestrians like Plaintiff Stubbs and minor-Plaintiff Z.C. by engaging in a high-speed police pursuit across city lines in a non-emergent situation and in violation of departmental policy and direct orders.  This conduct demonstrated an intent to harm that shocks the conscious.

63.     It was foreseeable that by pursuing Douglass with his lights and sirens activated, Defendant Merrell's conduct would cause Douglass to flee.  By pursuing Douglass without justification, and in violation of policy and direct orders from his supervisors, Defendant Merrell precipitated a high-speed chase in a densely populated area, that caused Plaintiff Stubbs and minor-Plaintiff Z.C. to be struck by Douglass' vehicle.

64.     But for the unauthorized, unwarranted and reckless pursuit initiated by Defendant Merrell, Douglass would not have engaged in a high-speed chase resulting in impact with and injury to Plaintiff Stubbs and minor-Plaintiff Z.C.

65.     The acts and omissions of Defendants directly and proximately caused the injuries and damages suffered by Plaintiff Stubbs and minor-Plaintiff Z.C.

66.     The dangerous and reckless conduct of Defendants were substantial factors in causing the injuries sustained by Plaintiff Stubbs and minor-Plaintiff Z.C.

17

67.    As a direct and proximate result of the reckless actions and conducts of Defendants,

Plaintiff Stubbs was caused to suffer and continues to suffer from the following:

a.  Concussion with loss of consciousness of unspecified duration

b.  Traumatic brain injury

c.  Multiple rib fractures

d.  Fracture of alveolus of maxilla

e.  Fracture of nasal bones

f.  Non-displaced fracture of first metatarsal bone, right foot

g.  Displaced fracture of second metatarsal bone, right foot

h.  Displaced fracture of third metatarsal bone, right foot

i.  Dislocation of tooth

j.  Scalp hematoma

k.  Abrasions and contusions

l.  Nausea

m.  Dizziness

n.  Photophobia

o.  Sensitivity to loud noise

p.  Fatigue

q.  Headaches

r.  Confusion

s.  Acute and chronic pain due to trauma

t.  Post traumatic amnesia

u.  Loss of life's pleasures

     v.  Pain and suffering

    w.  Mental anguish

    x.  Anxiety

    y.  Past and future medical expenses; and

    z.  Past and future lost earnings and lost earning capacity.

    68.    As a direct and proximate result of the reckless actions and conduct of Defendants, minor-Plaintiff Z.C. was caused to suffer and continues to suffer from the following:

    a.  Severe traumatic brain injury with loss of consciousness

    b.  Cerebrovascular disease

    c.  Gait and mobility abnormalities

    d.  Right holohemispheric subdural hematoma with left midline shift

    e.  Left holohemispheric subdural hematoma

    f.  Cervical (C1-C2 to C5-C6) interspinous ligament injury

    g.  Cognitive deficits

    h.  Liver laceration

    i.  Pulmonary contusion

    j.  Hypertension

    k.  Bradycardia

    l.  Right craniotomy with bone flap removal

    m.  Cranioplasty

    n.  Decompressive craniectomy

    o.  Intubation

    p.  Extubation

q.  Placement of NG tube

r.  Urinary retention

s.  Subcapsular hepatic laceration

t.  Right superior ischial ramus fracture

u.  Left superior pubic and left ischial rami fractures

v.  Displaced transverse bilateral inferior ischial rami fractures

w.  Nondisplaced left ischial body fracture

x.  Anterior sacral body fracture

y.  Left ischiopubic synchondrosis disruption

z.  Complex bilateral pelvic fractures

aa. Fracture of right pubis

bb. Fracture of sacrum

cc. Headaches

dd. Dizziness

ee. Neurologic decompensation

ff.  Bone flap instability

gg. Hemicranial revision surgery

hh. Subdural fluid collection

ii.  Right temporal/frontal swelling

jj.  Left frontal ventricular EVD placement

kk.  Titanium plates

ll.  Acute and chronic pain due to trauma

mm. Loss of life's pleasures

nn. Mental anguish

oo. Anxiety

pp. Confusion

qq. Disfigurement

rr. Disability

ss. Humiliation

tt. Past and future medical expenses; and

uu. Past and future lost earnings and lost earning capacity.

69.     Defendants Merrell and the City of Philadelphia, acting under the color of state law, affirmatively caused Plaintiff Stubbs and minor-Plaintiff Z.C. to be subjected to the deprivation of rights, privileges and immunities guaranteed by the Constitution and the law, including Plaintiff Stubbs' and minor-Plaintiff Z.C.'s substantive due process rights guaranteed by the Fourteenth Amendment.

70.     Accordingly, Plaintiff, Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a minor and Lillie Mae Stubbs, brings this civil action against Defendants Dwayne Merrell and the City of Philadelphia, pursuant to 42 U.S.C. § 1983, and the doctrinal tenets interpreting this statute, and seek all damages cognizable by law.

## COUNT I - CIVIL RIGHTS
**Plaintiff, Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a minor and Lillie Mae Stubbs v. Defendant Dwayne Merrell and Defendant City of Philadelphia**

71.     The preceding paragraphs and allegations stated above are incorporated by reference as though fully set forth herein.

72.     At all times material hereto, Dwayne Merrell and the City of Philadelphia acted under color of state law.

73.     Defendants' conduct, as set forth above and herein, evinces a state-created danger.

74.     By engaging in an unjustified and protracted high-speed police pursuit across city lines and in a densely populated area without reasonable belief that Douglass committed a requisite offense and/or posed an immediate threat to public safety, and in direct violation of police policy and his supervisors' direct orders, Defendants Merrell and the City of Philadelphia, as set forth above, acted with deliberate indifference and a conscious and reckless disregard to the safety, bodily integrity, well-being, liberty and substantive due process rights of Plaintiff Stubbs and minor-Plaintiff Z.C. as guaranteed by the Fourteenth Amendment.

75.     By engaging in an unjustified and protracted high-speed police pursuit across city lines and in a densely populated area without reasonable belief that Douglass committed a requisite offense and/or posed an immediate threat to public safety, and in direct violation of police policy and his supervisors' direct orders, Defendants Merrell and the City of Philadelphia, as set forth above, acted with deliberate indifference and conscious disregard of the great risk of serious harm to Plaintiff Stubbs and minor-Plaintiff Z.C.

76.     By engaging in an unjustified and protracted high-speed police pursuit across city lines and in a densely populated area without reasonable belief that Douglass committed a requisite offense and/or posed an immediate threat to public safety, and in direct violation of police policy and his supervisors' direct orders, Defendants Merrell and the City of Philadelphia, as set forth above, acted with an intent to cause harm.

77.     By engaging in an unjustified and protracted high-speed police pursuit across city lines and in a densely populated area without reasonable belief that Douglass committed a requisite offense and/or posed an immediate threat to public safety, and in direct violation of police policy

and his supervisors' direct orders, the conduct of Defendants Merrell and the City of Philadelphia, as set forth above, was so egregious as to shock the conscience.

78.     Defendant Merrell's failure to render aid to Plaintiff Stubbs and minor-Plaintiff Z.C. and his failure to notify emergency services that Plaintiff Stubbs and minor-Plaintiff Z.C. needed immediate medical attention in favor of continuing his unjustified pursuit of Douglass evidences his intent to harm and shocks the conscience.

79.     Defendant Merrell's repeated, bald-face lies concerning his pursuits of Douglass and the injuries to Plaintiff Stubbs and minor-Plaintiff Z.C., including the falsification of police documentation, evidence his guilty knowledge that Plaintiff Stubbs and minor-Plaintiff Z.C. had a clearly established constitutional right to bodily integrity and right to be free of state created danger such as his pursuit of Douglass.

80.     Defendants' conduct, as set forth above, demonstrates Defendants' conduct affirmatively created an opportunity that otherwise would not have existed for harm to Plaintiff Stubbs and minor-Plaintiff Z.C. to occur.

81.     Defendants' conduct, as set forth above, demonstrates that Defendants unreasonably and unjustifiably placed Plaintiff Stubbs and minor-Plaintiff Z.C. in a foreseeably dangerous position.

82.     Defendants' conduct, as set forth above, demonstrates that the harm caused to Plaintiff Stubbs and minor-Plaintiff Z.C. was a foreseeable and fairly direct result of Defendants' conduct.

83.     Defendants' conduct, as set forth herein, violated Plaintiff Stubbs and minor-Plaintiff Z.C.'s constitutional rights, as guaranteed by the United States and Pennsylvania

Constitutions, and remediable under 42 U.S.C. § 1983, including Plaintiff Stubbs' and minor-Plaintiff Z.C.'s substantive due process rights as guaranteed by the Fourteenth Amendment.

84.    Defendants Merrell and the City of Philadelphia were aware that Plaintiff Stubbs and minor-Plaintiff Z.C. had a clearly established constitutional right to bodily integrity and right to be free of state created danger at the time of the incident.

85.    As a direct and proximate result of Defendants' unreasonable, unjustifiable and unconstitutional conduct, Plaintiff Stubbs and minor-Plaintiff Z.C. were caused to suffer the injuries described in Paragraphs 67 and 68 of Plaintiffs' Amended Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Dwayne Merrell and the City of Philadelphia, and compensatory damages, jointly and severally, together with attorney fees and costs, and pre- and post-judgment interest. Plaintiffs hereby certify pursuant to Local Civil Rule 53.2(3) that the value of Plaintiffs' claim is in excess of $150,000 exclusive of interest and costs, and that Plaintiffs' claim alleges a violation of rights secured by the U.S. Constitution.

### COUNT II - CIVIL RIGHTS
**Plaintiffs, Lyesha Clark, Individually, and as Parent and Natural Guardian of Z.C., a minor and Lillie Mae Stubbs v. Defendant City of Philadelphia**

86.    The preceding paragraphs and allegations stated above are incorporated by reference as though fully set forth herein.

87.    The conduct as set forth above and herein evinces a state-created danger in violation of Plaintiff Stubbs' and minor-Plaintiff Z.C.'s constitutional rights, including the substantive due process rights of Plaintiff Stubbs and minor-Plaintiff Z.C. as guaranteed by the Fourteenth Amendment.

88.    The conduct as set forth above demonstrates that Defendant, City of Philadelphia, failed to adequately train police officers and/or failed to have an adequate training policy regarding

the appropriate and justifiable use of police vehicular pursuits; the appropriate and justifiable use of high speed chases; and the risk posed by police pursuits and high speed chases to pedestrians and innocent bystanders, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights including their substantive due process rights as guaranteed by the Fourteenth Amendment.

89.    The conduct as set forth above demonstrates that Defendant, City of Philadelphia, failed to adequately supervise and/or monitor police vehicular pursuits; high speed chases; and compliance with the police department's written policies regarding police pursuits and high speed chases and/or failed to have an adequate training policy on the supervision and/or monitoring of police pursuits; high speed chases; and compliance with the police department's written policies regarding police pursuits and high speed chases, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

90.    The conduct set forth above demonstrates that Defendant, City of Philadelphia, failed to enforce the police department's written policies regarding the use of police vehicular pursuits and high speed chases and/or had an unwritten policy or custom regarding the use of police vehicular pursuits and high speed chases that differed and/or was contrary to the police department's written policies regarding police vehicular pursuits and high speed chases and/or had an unwritten policy or custom that authorized and/or sanctioned officers not to follow the police department's written policies regarding police vehicular pursuits and high speed chases, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

91.    The conduct set forth above indicates that Defendant, City of Philadelphia, had inappropriate policies, procedures, customs and practices with respect to the use of police vehicular pursuits; the use of high-speed chases; and the risk posed by police vehicular pursuits and high-

25

speed chases to pedestrians and innocent bystanders, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

92.     The conduct as set forth above demonstrates that Defendant, City of Philadelphia, failed to adequately train, and/or failed to have an adequate training policy regarding the vehicular pursuit of persons into neighboring jurisdictions, including without permission from a higher-ranking supervisor or the authorization and/or notification of the neighboring jurisdiction, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

93.     The conduct set forth above indicates that Defendant, City of Philadelphia, failed to enforce policies regarding the pursuit of persons into neighboring jurisdictions, including without permission from a higher-ranking supervisor or the authorization and/or notification of the neighboring jurisdiction, and/or had an unwritten policy or custom that authorized and/or sanctioned pursuit without permission from a higher-ranking supervisor or the authorization and/or notification of the neighboring jurisdiction, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

94.     The conduct set forth above indicates that Defendant, City of Philadelphia had inappropriate policies, procedures, customs and practices with respect to the vehicular pursuit of persons into neighboring jurisdictions, including without permission from a higher-ranking supervisor or the authorization and/or notification of the neighboring jurisdiction, thereby depriving Plaintiff Stubbs and minor-Plaintiff Z.C. of their constitutional rights.

95.     The above-referenced actions demonstrate a deliberate indifference and conscious disregard of great risk of harm to persons like Plaintiff Stubbs and minor-Plaintiff Z.C.

96.     The above-referenced actions are outrageous, egregious, and conscience-shocking, and rise to a level of intention to cause harm.

97.    As a direct and proximate result of Defendants' unreasonable, unjustifiable and unconstitutional conduct, Plaintiff Stubbs and minor-Plaintiff Z.C. were caused to suffer the injuries described in Paragraphs 67 and 68 of Plaintiffs' Amended Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Dwayne Merrell and the City of Philadelphia, and compensatory damages, jointly and severally, together with attorney fees and costs, and pre- and post-judgment interest. Plaintiffs hereby certify pursuant to Local Civil Rule 53.2(3) that the value of Plaintiffs' claim is in excess of $150,000 exclusive of interest and costs, and that Plaintiffs' claim alleges a violation of rights secured by the U.S. Constitution.

## CLAIM FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered against all Defendants for damages to be determined at trial, and for all other and further relief as the Court may deem just and equitable.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By: _____

THOMAS R. KLINE, ESQUIRE
TRACIE L. PALMER, ESQUIRE
PRISCILLA E. JIMENEZ, ESQUIRE
Attorney ID Nos.: 28895/312098/312403
1525 Locust Street
Philadelphia, PA 19102
215-772-1384 (p)
215-735-0937 (f)
*Attorneys for Plaintiffs*

Dated: 7/25/19

27

## CERTIFICATE OF SERVICE

I, Tracie L. Palmer, Esquire, hereby certify that Plaintiffs' Amended Complaint was

filed on the date set forth below and served upon the parties below via electronic mail:


Armando Brigandi, Esquire
Chief Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
*Attorney for Defendant City of Philadelphia Police Department*


Nicholas A. Cummins, Esquire
Bennett, Bricklin & Saltzburg LLC
1601 Market Street, 16th Floor
Philadelphia, PA 19103
*Attorney for Defendant, Dwayne Merrell*


**KLINE & SPECTER, P.C.**

By: _____

TRACIE L. PALMER, ESQUIRE
ID NO. 312098
1525 Locust Street
Philadelphia, PA 19102
215-772-1384 (p)
215-735-0937 (f)
tracie.palmer@klinespecter.com

Date: 7/25/19

# EXHIBIT A

# MEMORANDUM

POLICE
CITY OF PHILADELPHIA
DATE: 3-26-19

TO   :   Police Commissioner

FROM :   Commanding Officer, Internal Affairs Division

SUBJECT: __INTERNAL INVESTIGATION IAD# 17-1059__

__ALLEGATION:__

On Saturday, 4-15-17, the Internal Affairs Division was notified by D/C Myron Patterson of an auto accident in Upper Darby, PA during a vehicle pursuit involving a Philadelphia police officer. IAD #17-1059 was issued.

On Saturday, 4-15-17, at approximately 1:05 PM, police personnel assigned to the All Terrain Vehicle (ATV) Enforcement Detail in ROC South, began following a green and white motorcycle in the area of 55th St. and Chester Ave. The motorcycle was wanted for city code and motor vehicle code violations only. At approximately 1:08 PM, P/O Dwayne Merrell #7078, operating a marked BMW motorcycle, as 16M-2, attempted to initiate a vehicle stop of the green and white motorcycle in the area of 5400 Willows Ave. The green and white motorcycle, operated by a black male in a red hooded sweatshirt fled the area and P/O Merrell initiated a vehicle pursuit. The green and white motorcycle eventually entered Upper Darby Twp. with P/O Merrell still engaged in close vehicular pursuit.

While in Upper Darby Twp., the green and white motorcycle was traveling at a high rate of speed northbound on 69th St. at Ludlow St., and did strike two pedestrians critically injuring them. Struck were Lillie Stubbs 44/B/F and █████████/B/F. After the collision, the operator of the motorcycle, Caliph Douglass 32/B/M, carjacked a vehicle at 69th St. and Chestnut St. and fled eastbound on Market St. Caliph Douglass was apprehended at 63rd St. and Market St. by P/O Hoback #93, Upper Darby Police Department (UDPD) and charged with: Aggravated Assault, Theft, Robbery, Fleeing and Eluding Police, and related offenses.

**A check of the computerized personnel database revealed:**

**P/O Dwayne Merrell #7078, PR# 227794, was appointed on 3-3-97, and assigned to the 16th District on 2-9-09.**

**Lt. Joseph Ruff #330, PR# 217237, was appointed on 12-27-93, and assigned to the 12th District on 12-19-11.**

**Lt. Michael Frisco #419, PR# 250986, was appointed on 3-1-04, and assigned to the 14th District on 12-3-18.**

1

PCD Sara Mitchell, PR# 286259, Police Radio, was appointed on 12-14-15, and assigned to Police Radio on 12-14-15.

PCD Iraida Delgado, PR# 233836, Police Radio, was appointed on 10-19-98, and assigned to Police Radio on 11-07-07.

On Monday, 4-17-17, Lt. James Clough #127, Internal Affairs Division, was assigned the investigation.

## INVESTIGATIVE ANALYSIS:

On 4-15-17, P/O Dwayne Merrell #7078 responded to the UDPD and provided a witness statement to the assigned UDPD investigators, as well as detailing the route he traveled through Upper Darby while in pursuit of the green and white motorcycle.

A Philadelphia Police Radio audio reproduction of Special Events 1 band on 4-15-17, was obtained and has been added to this investigation. The audio reproduction contains the following in relation to the pursuit of the green and white motorcycle:

1:05:08 PM, 12E broadcasted a green and white motorcycle, with a black male operator wearing a red hooded sweatshirt, in the area of Allison St. and Vodges St.

1:06:22, 12E broadcasted that the green and white motorcycle was traveling northbound on 55th St. from Springfield Ave. and then eastbound on Windsor Ave. from 55th St.

1:08:02, 12E broadcasted that the green and white motorcycle was traveling northbound on 55th St. from Florence Ave.

1:08:24, 12E broadcasted that the green and white motorcycle was traveling eastbound on Willows from 55th St.

1:08:45, 12E broadcasted the motorcycle was lost in the area, last seen eastbound on Willows from 55th St., possibly in the driveways.

1:17:36, UCBD1 spotted the green and white motorcycle traveling southbound on 52nd St. from Baltimore Ave., then westbound on Baltimore Ave.

1:18:50, "M1" broadcasted that the green and white motorcycle was at 52nd and Warrington (16M-2 broadcasted with sirens audible). BD1 "westbound on Malcolm from 55th."

1:20:01, Radio "key ups" "northbound on Cobbs Creek" "59 and Cobbs" "going into the woods." Dispatcher asks who is out there; 16M-2 broadcasted that it was him.

1:20:49, Several radio "key ups" with sirens in the background – unintelligible broadcasts – 16M-2 "northbound on Cobbs from (or Christian St.), 6100 Chestnut St." Radio "key ups" and unintelligible transmissions followed by "Christian." Radio attempted to confirm the location by

2

asking, "Cobbs Creek and Christian?" Radio attempted to raise 16M-2, followed by "6100 Chestnut."

1:23:32, 16M-2, "Southbound 60th from Locust...eastbound Spruce. 12E broadcasted, "We are not pursuing this dirt bike through the city here, let's try to get a last location and try to box him in." Police Radio acknowledges 12E and attempts to raise 16M-2 for acknowledgement. 16M-2 replied, "Southbound 60 – last seen."

1:26:53, 12M1 asked for the last location of 16M-2. Police Radio advised 12M1 "last location 60th and Spruce" followed by inaudible transmissions.

1:29:04, 12M1 requested 16M-2's location again.   An unknown person responded, "63 and Market."

1:29:59, Philadelphia Police Radio received a phone call from an unknown caller reporting a car that had gone into the woods and a male fled the car at Park Ave. and Market St. in Millbourne.

1:31:20, 12X broadcasted, "Any of my units know if they see anything, let's just try to get a location before we try and go after it. I know it's tough, we're sharing air tac, let's try to get them down here before the guy takes off."

1:39:32, Upper Darby Police Radio called the Philadelphia Police Radio room and asked if a pursuit from Philadelphia came into Delaware County.

1:44:04, Upper Darby Police Radio called the Philadelphia Police Radio room and requested that a Philadelphia Police commander respond to 69th Street, at the Tower Theater, to meet Upper Darby Police personnel.

On 4-20-17, Lt. Clough was provided a DVD that contained a compilation of surveillance camera footage obtained by members of the UDPD. The various surveillance recordings show the green and white motorcycle, with a black male wearing a red hooded sweatshirt, being pursued by a Philadelphia Police officer operating a marked police motorcycle. It should be noted that the video recordings are from various sources/locations in Upper Darby, PA. The video compilation shows the continuous progression of the pursuit beginning in the area of 6200 Baltimore Pike and the final video is from 6400 Market St. It should also be noted that any time stampings seen on the videos may not be accurate since they were obtained from various locations and are presumably not synched in any manner.

- At an unknown time (no timestamp on video) the video begins in the area of Baltimore Pike near Church Lane in Upper Darby Twp. PA. P/O Merrell is observed in close pursuit of the green and white motorcycle traveling westbound on Baltimore Pike.

- 13:33:02, the pursuit is seen northbound on Church Ln. and eventually onto northbound 69th St.

- 13:27:19, the green and white motorcycle is observed on the unit block of 69th St. traveling northbound. This view is from the UDPD mini-station (camera facing south/southeast).

3

- 13:27:32, P/O Merrell is observed on the unit block of 69th St. traveling northbound. This view is from the UDPD mini-station (camera facing south/southeast).

- 13:27:22, the green and white motorcycle is seen striking the pedestrians. The operator (wearing a red hooded sweatshirt) is seen running from the scene northbound on 69th St. This view is from the UDPD mini-station (camera facing north/northeast).

- 13:27:48, P/O Merrell passes the collision scene. This view is from the UDPD mini-station (camera facing north/northeast).

- 13:27:55, A camera at 69th St. and Market St. recorded the male in the red hooded sweatshirt operating a dark Nissan turning eastbound onto Market St. (camera is facing south).

- 13:27:57, a camera at 69th St. and Market St. recorded P/O Merrell turning eastbound onto Market St. following the stolen Nissan closely (camera is facing south).

- 13:27: (no seconds), the stolen Nissan and P/O Merrell are seen traveling eastbound on Market St. (camera facing eastbound).

- 13:28: (no seconds), P/O Merrell is seen pursuing the stolen Nissan eastbound on Market St. P/O Merrell is seen with his emergency lights off for a period of approximately 5.5 seconds. After the 5.5 seconds, P/O Merrell's emergency lights are back on as he continued pursuing the stolen Nissan.

- 13:28:26, the stolen Nissan is seen entering a lot in the 6300 block of Market St. where the driver abandons the Nissan.

- 13:28:47, P/O Merrell is seen traveling eastbound on Market St., in what appears to be a non-emergency speed (no emergency lights appear to be activated) passing the lot where the Nissan was abandoned.

- 13:28:52, P/O Merrell is last observed traveling eastbound on 6300 Market St. nearing the city boundary.

Lt. Clough obtained arrest paperwork from members of the UDPD related to the pursuit of the green and white motorcycle that had been initiated by a member of the Philadelphia Police Department on 4-15-17. The offender was identified as Caliph Douglass, 31/B/M, 1746 S. Ringgold St., Philadelphia, PA 19145.

On 4-21-17, Lt. Clough obtained the portable police radio #861646 from the 16th District, which was assigned to P/O Merrell on 4-15-17.

On 4-22-17, Lt. Clough conducted a radio performance check of portable radio #861646 in Upper Darby Twp. The radio functioned properly and a Police Radio audio reproduction of the radio checks were obtained and is included in this report. The times and locations of the performance checks are as follows:

4

1. 11:23 AM, 6200 Baltimore Pike, Upper Darby Twp.
2. 11:25 AM, Church Ln. and Pembroke Ave., Upper Darby Twp.
3. 11:28 AM, Church Ln. and Marshall Rd., Upper Darby Twp.
4. 11:29 AM, Unit block of 69th St. (accident scene), Upper Darby Twp.
5. 11:31 AM, Market St. and Glencoe Rd., Upper Darby Twp.

**Charles Paris, 37/B/M, 25 Oak Ave., East Lansdowne, PA 19050, was interviewed at Michael's Used Cars, 25 Oak Ave., East Lansdowne, PA 19050, on 4-18-17, by Lt. Clough #127 and Lt. Morton #350.**

Charles Paris stated he was at 25 Oak Ave, East Lansdowne, PA on 4-15-17, at approximately 1:25 PM. Charles Paris observed a male on a motorcycle travel past the location at a high rate of speed, followed by the sound of a siren and a police officer operating a motorcycle at a high rate of speed. Charles Paris described the police motorcycle "like a big Highway Patrol bike, no shield, with bags on it."

Charles Paris believed that the male being chased was wearing a helmet with a spike on top of it. Charles Paris stated that there had been a lot of pedestrian and vehicle traffic at the time. Charles Paris only saw one police motorcycle chasing the other motorcycle. Charles Paris did not see any police cars involved in the chase of the motorcycle.

**PCD Iraida Delgado, PR# 233836, Police Radio, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 and Lt. Newsome #142 on 12-19-17.**

PCD Delgado stated she was working an ATV overtime detail, along with PCD Sara Mitchell, on her day off, on 4-15-17. The detail was on Special Events 1. PCD Delgado believed she had worked the 10:00 AM to 6:00 PM or the 11:00 AM to 7:00 PM shift (DARs indicate PCD Delgado worked 10:30 AM to 7:00 PM).

PCD Delgado did not recall 12E spotting, and begin following a green and white motorcycle in the area of 5500 Chester Ave., on 4-15-17, at approximately 1:05 PM. PCD Delgado stated she could only recall one of the units on the detail say something about a green and white ATV. PCD Delgado stated all she could hear was air or wind coming over the radio.

PCD Delgado stated she was not aware that a green and white motorcycle was being followed by anybody; every time PCD Delgado asked for a location, all that she could hear was wind. PCD Delgado stated she asked several times if the unit was OK, and all she heard was wind. PCD Delgado was unsure what unit it was that she was concerned about, although she believed it was one of the units on the ATV detail. PCD Delgado recalled that the helicopter was not available to assist as they had gone down a few minutes earlier for service.

Although PCD Mitchell had initially been broadcasting when the green and white motorcycle was being followed, PCD Delgado stated she was at the console monitoring the radio band. Although she had been monitoring the radio band, PCD Delgado stated she did not realize how much geographical area the green and white motorcycle had covered between 1:05:08 PM and 1:26:53

5

PM. When asked if she believed the green and white motorcycle had been pursued by police, PCD Delgado stated she was not sure.

PCD Delgado stated that she never heard sirens in the background during the radio transmissions of 16M-2 (P/O Merrell). At no time did PCD Delgado believe that an officer had been in a foot pursuit, or engaged in a physical confrontation. PCD Delgado stated she did not recall Lt. Frisco (12-E) broadcasting, "We're not pursuing this dirt bike through the city here. Let's try to get a last location and try to box him in."

PCD Delgado stated that she was unaware that anything had occurred in Upper Darby Twp. until PCD Ed McDermott inquired. PCD Delgado stated she was not alarmed by the broadcasts that contained only "wind" because she was accustomed to it having worked T-Band. PCD Delgado could not recall any units working the ATV detail in Southwest Division responding to the Cobbs Creek Park area for an officer in possible danger, or in a foot pursuit.

**Lt. Joseph Ruff #330, PR# 217237, 12th District, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 and Lt. Newsome #142, on 11-2-17.**

Lt. Ruff stated he was assigned to the ATV Enforcement Detail in ROC South, on 4-15-17, as 12-X. Lt. Ruff believed that the hours of the detail were 10:00 AM to 6:00 PM or 11:00 AM to 7:00 PM (DARs indicate Lt. Ruff worked 11:00 AM to 7:00 PM). Lt. Ruff could not recall the radio band the detail had operated on; but he did recall that it was a band for the ATV detail only. Lt. Ruff believed the detail might have used the Special Event radio band. Lt. Ruff stated that he had monitored the police radio band during the ATV detail on 4-15-17. Lt. Ruff stated the supervisors assigned to the ATV detail in ROC South were him and Lt. Michael Frisco.

Lt. Ruff said that there had been a roll call at the beginning of the ATV detail. Lt. Ruff stated that the officers assigned to the detail had been given copies of the ATV directive, as well as sample TVR's and tow forms. Lt. Ruff stated that he and Lt. Frisco had repeatedly emphasized that there would be no pursuits.

Lt. Ruff stated that he had been monitoring the radio when Lt. Frisco had first spotted the green and white motorcycle in the area of 5500 Chester Ave. Lt. Frisco continued to monitor, and update Police Radio, as the burglary team (UCBD1) continued to maintain visual contact with the green and white motorcycle. Lt. Ruff was aware of the amount of distance the green and white motorcycle covered between 1:05:08 and 1:26:53 as Lt. Frisco and the burglary team had followed it. Lt. Ruff stated he had been unaware of P/O Merrell's travel distance until the end of his transmissions.

Lt. Ruff initially did not think that P/O Merrell had been engaged in a pursuit of the green and white motorcycle until the end of his transmissions. Lt. Ruff stated he began to investigate P/O Merrell's actions when he had been notified to contact Delaware County.

Lt. Ruff stated he did hear P/O Merrell's siren at various times when P/O Merrell transmitted locations; although Lt. Ruff did not hear the siren the entire time. At some point, Lt. Ruff believed that P/O Merrell had been involved in a fight, or a foot pursuit. After the incident, Lt. Ruff learned

that the city had recently changed the police radios and the headsets were not compatible with the headsets worn by the motorcycle officers.

Lt. Ruff stated that he believed that an officer on a dirt bike may have been fighting someone. Lt. Ruff did not request a location of the unknown officer he believed may have been involved in a fight because he wanted to keep the air clear so that the involved officer could broadcast. Lt. Ruff stated that the officers had responded to Cobbs Creek and the park.

Although P/O Merrell broadcasted various locations, often with a siren in the background, for approximately 15 minutes, Lt. Ruff did not believe that there was 15 minutes of interrupted action with P/O Merrell and the green and white motorcycle. Lt. Ruff did not believe that P/O Merrell's initial transmission mentioning 5400 Willows was the beginning of what turned out to have been a pursuit. At some point, Lt. Ruff believed that P/O Merrell was in the park at Cobbs Creek; that's where Lt. Ruff believed that P/O Merrell was in trouble and radio had tried to raise P/O Merrell.

Lt. Ruff stated he was about to broadcast, by radio, that there were to be no pursuits; Lt. Frisco beat Lt. Ruff to it. Lt. Ruff believed that P/O Merrell acknowledged the broadcast. Lt. Ruff intended to take the appropriate action, but Lt. Ruff realized that P/O Merrell was already in the 12th District with Lt. Frisco. Lt. Ruff confronted P/O Merrell and asked him what happened. P/O Merrell told Lt. Ruff that he had seen the motorcycle go into the park at Cobbs Creek, onto the trails and P/O Merrell attempted to stop him. P/O Merrell told Lt. Ruff he could barely see the motorcycle due to a dust cloud. P/O Merrell told Lt. Ruff that he did not transmit over radio because he did not know where he was at. According to Lt. Ruff, P/O Merrell told him that at one point the green and white motorcycle may have stalled and P/O Merrell ran up to the motorcycle. The male was able to restart the motorcycle and P/O Merrell ran back to his motorcycle with the siren still on. The male on the motorcycle fled once again.

According to Lt. Ruff, P/O Merrell told him that he had exited the back of the woods onto a street that P/O Merrell knew was not in Philadelphia and P/O Merrell had seen the male two blocks ahead of him. Lt. Ruff stated that P/O Merrell told him that he knew he was out of the city and he was not supposed to be pursuing, so he stopped following the motorcycle and tried to find his way back into the city.

Lt. Ruff stated he told P/O Merrell that he thought that P/O Merrell had been fighting with someone because he could not hear him and Lt. Ruff has experienced officers leaving their sirens on when in need of assistance. P/O Merrell told Lt. Ruff that there had been a problem with his radio. Lt. Ruff asked P/O Merrell if he had lost the motorcycle, why did he continue to hear his siren over the radio. P/O Merrell told Lt. Ruff that he had gotten lost in Upper Darby. Lt. Ruff asked P/O Merrell if he had been in a pursuit; P/O Merrell replied, "No."

P/O Merrell told Lt. Ruff that he had followed the green and white motorcycle into the park and came out of the park on the Upper Darby side and could not see the motorcycle after that. Lt. Ruff stated that he was not sure if he believed P/O Merrell's story at that point because he felt that P/O Merrell may not be relating the entire story.

7

Lt. Ruff asked P/O Merrell if he had told him everything and P/O Merrell said, "Yes." Lt. Ruff asked P/O Merrell to simply tell him if there had been a pursuit. P/O Merrell assured Lt. Ruff that he had not been in a pursuit. As Lt. Ruff was going to investigate P/O Merrell's story, Lt. Ruff received a phone call from Lt. Hayes from the 24th District (Lt. Hayes was the lieutenant working the ATV detail in ROC North) and Lt. Ruff was asked to call the Police Radio room. Lt. Ruff had called Philadelphia Police Radio and was asked to contact Delaware County. Lt. Ruff responded to 69th St. in Upper Darby.

Lt. Ruff responded to 69th St. in Upper Darby and saw a large scene. Upper Darby police told Lt. Ruff that the information they received was that a Philadelphia Police Officer on a dirt bike had chased a green and white dirt bike. The green and white dirt bike was being chased by the Philadelphia Police dirt bike and the green and white dirt bike struck a lady and a girl crossing 69th St. Lt. Ruff was told that the Philadelphia Police motorcycle officer drove past the accident scene, northbound on 69th St. and turned right onto Market St. Lt. Ruff called Lt. Frisco and told him to speak with P/O Merrell again and for P/O Merrell to be truthful. Lt. Ruff instructed Lt. Frisco to take P/O Merrell into the 12th District and prepare a pursuit memorandum.

Lt. Ruff stated that Lt. Frisco told him that P/O Merrell had admitted to chasing the dirt bike into Upper Darby, but he denied seeing an accident or victims. Lt. Ruff said that later in the day, P/O Merrell admitted that he had pursued the dirt bike into Upper Darby, although P/O Merrell once again denied that he had seen the accident or the victims. Lt. Ruff stated that P/O Merrell denied that he saw the carjacking, or pursued the carjacked vehicle.

**PCD Sara Mitchell PR# 286259, Police Radio, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 on 11-7-17.**

PCD Mitchell stated she was working an overtime ATV detail on 4-15-17, along with PCD Delgado. PCD Mitchell was assigned to Special Events 1 radio band. PCD Mitchell stated she had limited recollection of the incident involving the green and white motorcycle that had been initially spotted by 12E (Lt. Frisco) at 5500 Chester Ave. at approximately 1:05 PM on 4-15-17. PCD Mitchell recalled someone trying to broadcast that they had been behind a motorcycle, but PCD Mitchell could not get a location after numerous attempts. PCD Delgado took over the air while PCD Mitchell monitored. PCD Mitchell believed that the unit, possibly 16M-3, said he was at 63rd St. and Cobbs Creek Pkwy. PCD Mitchell stated she was unable to recall the exact call sign, but she believed a street supervisor told the unit to remain there.

PCD Mitchell stated that she remained at the console between 1:05 PM and 1:29 PM. PCD Mitchell was unaware of how much geographical area the motorcycle had covered between 1:05:08 PM and 1:26:08 PM because they (Mitchell and Delgado) were unable to get the location from the unit that had been following the motorcycle.

PCD Mitchell stated she did not recall hearing a siren in the background while the unit was following the green and white motorcycle. PCD Mitchell said that the sound of wind "shooshing" was all she heard. PCD Mitchell did not generate DC numbers for a pursuit because she did not know that there had been a pursuit. PCD Mitchell stated that she could normally see, in real time, the radio number of a unit that is transmitting. PCD Mitchell did not have a list of radio numbers

8

of the officers assigned to the ATV detail on 4-15-17; therefore, she could not tell who had been transmitting.

**Sgt. Mark Mastropietro #436, PR# 214968, Research and Planning, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 and Lt. Newsome #142 on 11-14-17.**

Sgt. Mastropietro stated he was assigned to Police Radio as the floor supervisor on 4-15-17, working the day work tour.  Sgt. Mastropietro was aware that a phone call was received by PCD McDermott from the Upper Darby communications dispatch on 4-15-17.  Upper Darby inquired if a police pursuit occurred in Southwest Division.  Sgt. Mastropietro asked PCD Delgado and PCD Mitchell, who had been working the ATV detail on Special Events 1, if they had knowledge of a pursuit in the last 15-20 minutes.  PCD Mitchell and PCD Delgado told Sgt. Mastropietro that they were unaware of any pursuits.  Sgt. Mastropietro told PCD McDermott that there had been no pursuits and that information was relayed to Upper Darby dispatch.

Sgt. Mastropietro said that Upper Darby called Philadelphia Police Radio back a few minutes later and requested that a Philadelphia Police supervisor respond to the Tower Theater in Upper Darby.  Sgt. Mastropietro asked PCD Mitchell and PCD Delgado a second time if there had been a pursuit; they both told him no.  Sgt. Mastropietro gave PCD Mitchell and PCD Delgado a brief synopsis of what he had been told, he instructed PCD Delgado and PCD Mitchell to send a supervisor to the Tower Theater immediately.

**PCD Edward McDermott PR# 201902, Police Radio, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 and Lt. Newsome #142 on 12-7-17.**

PCD McDermott stated he was assigned to the Operations Desk at Police Radio, working day work on 4-15-17.  PCD McDermott said that he had received a phone call from Upper Darby Communications.  PCD McDermott asked the dispatchers on Special Events 1 (he could not recall who was assigned to Special Events 1) if they had any pursuits, and if the pursuits had left the city.  PCD McDermott believed that the Special Events 1 dispatchers told him that the ATV detail had ATVs flee; but none of the ATVs had gone outside of the city.

A reproduction of a phone call between PCD McDermott and Upper Darby dispatch had been played for PCD McDermott.  It had been pointed out that PCD McDermott had acknowledged that there had been a pursuit of an ATV by Philadelphia Police that had been broken off in the city before reaching Delaware County.  PCD McDermott stated that the dispatchers on Special Events 1 had provided him with that information that he relayed to Upper Darby dispatch.  PCD McDermott could not recall any of the particulars of the pursuit.

**Lt. Michael Frisco #419, PR# 250986, 14th District, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough 127 on 12-14-17.**

Note: Lt. Frisco was assigned to the 12th District and held the rank of sergeant at the time of the incident on 4-15-17.

9

Lt. Frisco stated he was RDO on 4-15-17, but he worked the ATV detail from late morning to late afternoon, or evening (DARs indicate Lt. Frisco worked 11:00 AM to 7:00 PM). Lt. Frisco used the call sign 12-E, but he could not recall the vehicle he was operating. Lt. Frisco believed the detail was utilizing Special Events 1 radio band.

Lt. Frisco stated that there was a roll call at the beginning of the detail. Lt. Frisco and Lt. Ruff reminded the officers on the detail that the pursuit policy still applied during the detail. Lt. Ruff handed out the directive on pursuits and ATVs. Lt. Frisco reminded the officers that the goal of the detail was to confiscate ATVs and not to make apprehensions. Lt. Frisco stated that P/O Merrell was present at the roll call.

Lt. Frisco stated that on 4-15-17, at approximately 1:05 PM, he spotted a green and white motorcycle being operated by a person wearing a red hooded sweatshirt in the area of 5500 Chester Ave. Lt. Frisco called for the motorcycle officers in the area to respond to the area. Lt. Frisco attempted to watch the motorcycle from a short distance away. The green and white motorcycle left the area and Lt. Frisco provided the location and direction to Police Radio.

Lt. Frisco stated several unmarked units kept picking up and losing the green and white motorcycle between 1:05:08 PM and 1:26:53 PM. Lt. Frisco did not believe that the green and white motorcycle was being pursued. Lt. Frisco did not know that P/O Merrell had pursued the green and white motorcycle until the very end of the incident. Lt. Frisco stated he believed that P/O Merrell may have been engaged in a foot pursuit, or a fight due to his poor radio transmissions and having broadcasted that he had been in the park. Lt. Frisco did not inquire as to P/O Merrell's location or status for a possible assist officer because Lt. Frisco wanted to keep the air clear for any further broadcasts by P/O Merrell. Lt. Frisco said he did not hear P/O Merrell's siren in the background because he had his own siren on as he attempted to get to the area that he believed P/O Merrell may have been having a problem.

Lt. Frisco did not believe that any unit, including P/O Merrell, had been in a vehicular pursuit because several units had spotted the green and white motorcycle and lost sight of it. Lt. Frisco did not think anyone was able to get close enough to the green and white motorcycle to initiate an attempt to stop it.

At 1:23:32, on Special Events 1 radio band, Lt. Frisco broadcasted, "We're not pursuing this dirt bike through the city here. Let's try to get a last location and try to box him in." Lt. Frisco recalled broadcasting the statement but explained that he wanted to make it clear that he wanted the officers to make no further attempts to locate, monitor, or track the green and white dirt bike. Lt. Frisco wanted to make it clear that they were letting this dirt bike go. Lt. Frisco had realized that it would be difficult to box in a dirt bike with another dirt bike. Lt. Frisco explained that what he meant by "boxing in" was a tactic that was often used in the past. The tactic was having several dirt bikes come in from different directions with a goal of the operator abandoning the dirt bike and fleeing on foot so that the dirt bike could be confiscated.

Lt. Frisco later located P/O Merrell at Cobbs Creek Pkwy. and Springfield Ave. Lt. Frisco asked P/O Merrell about the incident that he believed had been a foot pursuit or a fight. According to Lt. Frisco, P/O Merrell told him that the dirt bike had pulled into a wooded area of the park and P/O Merrell had lost sight of the dirt bike. P/O Merrell told Lt. Frisco that after losing sight of the dirt bike in the wooded area, he rode out of the park. P/O Merrell also told Lt. Frisco that he saw the dirt bike in the distance and tried to give the best location available. P/O Merrell told Lt. Frisco that he had never gotten close enough to initiate a traffic stop. When Lt. Frisco asked P/O Merrell about the garbled radio transmissions, P/O Merrell told Lt. Frisco that his headset was not compatible with the newly issued portable radio. Lt. Frisco stated he had asked P/O Merrell if he had chased the dirt bike and P/O Merrell said, "No." Lt. Frisco had no reason to not believe P/O Merrell at that time. When asked by Lt. Frisco, P/O Merrell denied that he ever pursued, or initiated a traffic stop of the green and white motorcycle at any time. Lt. Frisco stated P/O Merrell made no mention of the carjacking at 69th St. and Market St., or a pursuit of the carjacked vehicle.

Within an hour after speaking to P/O Merrell at Cobbs Creek Pkwy and Springfield Ave., Lt. Frisco received a call from Lt. Ruff who told him that he was asked to respond to 69th St. near the SEPTA terminal in Upper Darby in reference to a Philadelphia Police dirt bike possibly having been involved in a pursuit in Upper Darby. The pursuit ended with several pedestrians being struck and a carjacking. Lt. Frisco had all the dirt bikes assigned to the ATV detail meet him at a location in the 19th District. Lt. Frisco addressed the entire group and told them what information he had at that time. Lt. Frisco asked the group if anyone wanted to come clean, that this was the time. P/O Merrell raised his hand and said that he had chased a dirt bike through Upper Darby.

P/O Merrell told Lt. Frisco that he had spotted the dirt bike a few minutes after Lt. Frisco went over the air and said not to pursue the dirt bike. According to Lt. Frisco, P/O Merrell told him that he had chased the dirt bike through the park, into Upper Darby, and north on 69th St. and he returned to the city. P/O Merrell denied that he had seen a crash or a carjacking. Lt. Frisco ordered P/O Merrell to accompany him to the 12th District to prepare pursuit paperwork.

**P/O Dwayne Merrell #7078, PR# 227794, 16th District, was interviewed at the Internal Affairs Division Headquarters by Lt. Clough #127 and Lt. Duccilli #459 on 12-13-18.**

P/O Merrell stated he worked the ATV detail on his day off on 4-15-17. P/O Merrell worked 11:00 AM to 7:00 PM as 16M-2. P/O Merrell was operating a marked BMW motorcycle during the ATV detail and he believed that he had inspected his police radio and emergency equipment at the beginning of the detail. P/O Merrell believed that all of his equipment worked properly.
P/O Merrell thought there had been a roll call at the DVIC at the beginning of the detail; he was not sure though. P/O Merrell was not sure, but he believed that he had been provided with police forms (directives, orders, sample forms, etc.) by the supervisors (Lt. Ruff and Lt. Frisco) at the beginning of the detail.

P/O Merrell recalled a BD team had spotted a green and white motorcycle around 1:05 PM on 4-15-17, in the area of 5500 Chester Ave. P/O Merrell was unable to recall exactly where, but he, along with other motorcycle officers, attempted to stop the green and white motorcycle. P/O Merrell said that the other motorcycle officers were behind him and he could not say how long they were with him while he attempted to catch up to the green and white motorcycle. P/O Merrell

stated he may have initially attempted to stop the green and white motorcycle at 59th St. and Cobbs Creek Pkwy. P/O Merrell stated the reason for the traffic stop was for being an illegal vehicle/bike on the street. Once P/O Merrell attempted to initiate a traffic stop by activating his lights and sirens, the green and white motorcycle fled. P/O Merrell began a pursuit of the green and white motorcycle.

P/O Merrell stated that he started the pursuit at 59th St. and Cobbs Creek Pkwy., traveled through the park, exited the park near 61st St. and Chestnut St., to 60th St. and Spruce St., south on 60th St. and entered Upper Darby. P/O Merrell said he attempted to provide his locations to Police Radio as the pursuit progressed. P/O Merrell was not aware that some of his transmissions did not go through. P/O Merrell denied that he had been in a foot pursuit or a fight on 4-15-17. P/O Merrell stated he had been unaware that he entered Upper Darby until he saw the 69th St. overpass [at Market St.].

P/O Merrell was unsure as to the specific route that he had traveled through Upper Darby, although he did go to the Upper Darby Police Department on the evening of 4-15-17, and highlighted a map of the route that he believed had been correct. P/O Merrell estimated that the pursuit speeds may have reached 60 mph. P/O Merrell stated he was not aware that two pedestrians had been struck by the fleeing green and white motorcycle. P/O Merrell denied that he saw the green and white motorcycle lying in the highway as he drove past the scene of the collision. P/O Merrell said that he learned about the collision when he spoke to his supervisors.

P/O Merrell stated he did see what appeared to be the male on the green and white motorcycle getting into a vehicle on 69th St. and drive away. P/O Merrell was unsure if it was the male from the motorcycle, and he attempted to go after the vehicle. Not being sure if the vehicle was involved, P/O Merrell let the vehicle go. P/O Merrell acknowledged that he briefly pursued the stolen vehicle, operated by the male in the red hooded sweatshirt, eastbound on Market St. from 69th St. to just prior to re-entering the city limits. P/O Merrell acknowledged that he did not notify Police Radio that he had been engaged in the pursuit of the stolen vehicle from 69th St. and Market St. P/O Merrell failed to notify anyone that he had been engaged in a second vehicular pursuit. P/O Merrell stated he did not provide any flash information in reference to the dark Nissan he had pursued; nor did he make any effort to report any of the unusual events to the Upper Darby Police Department.

P/O Merrell stated he did not report the pursuits to his supervisors until his supervisors inquired. P/O Merrell said that once asked, he told Lt. Frisco that he had pursued the green and white motorcycle into Upper Darby. P/O Merrell stated he did not make an attempt to deny his involvement as far as pursuing the motorcycle into Upper Darby when questioned. P/O Merrell told Lt. Frisco that he had no knowledge that a collision occurred. P/O Merrell stated he did not report the pursuit of the stolen vehicle because he was not sure what he had, and he was fearful of getting into trouble.

Note: P/O Merrell prepared and signed Philadelphia Police Department and Pennsylvania State Police pursuit memorandums. The Philadelphia Police Department pursuit memorandum listed the duration of the green and white motorcycle pursuit as lasting "8" city blocks and a time duration of "2" minutes. There is no mention of a second vehicular pursuit for the stolen Nissan.

When questioned, P/O Merrell acknowledged that the pursuit of the green and white motorcycle lasted approximately 6-7 miles and a time duration of 8-10 minutes. P/O Merrell guessed that the pursuit of the stolen Nissan lasted approximately 3-4 blocks. P/O Merrell denied that he intentionally omitted information from the pursuit memorandums although he acknowledged that he should have updated the memorandum after learning more information that evening.

P/O Merrell acknowledged that the narrative he prepared on the pursuit memorandum was incomplete and he in fact had pursued the green and white motorcycle farther than what was documented on the report. P/O Merrell stated he should have included the distance that he traveled prior to entering the park and traveling into, and through Upper Darby.

Note: No indications are noted on the Philadelphia Police nor Pennsylvania State Police pursuit memorandums that an accident, or collision had occurred as a result of the pursuit of the green and white motorcycle.

P/O Merrell responded to the Upper Darby Police Department on the evening of 4-15-17, to provide a statement in reference to the pursuit of the green and white motorcycle. When interviewed by the Upper Darby Police Department detectives about the vehicular and pedestrian traffic in Upper Darby during the pursuit, P/O Merrell responded, "There was a clear danger to pedestrians in the park, and on the roadways, as well as other motorists in the area." When questioned by the assigned Internal Affairs investigator, P/O Merrill clarified the statement by adding that anytime you are pursuing a vehicle in a park, pedestrians could be struck because they do not expect motorcycles to come through the park. P/O Merrell added that pedestrians and motor vehicles in roadways are potentially in danger of being struck as well. P/O Merrell stated that there were no near accidents that he saw while the motorcycle was on the roadways. P/O Merrell stated that he continued to pursue the motorcycle to stop it before any accidents could occur.

P/O Merrell wished to add that he realized he should not have pursued the motorcycle. The last thing he wanted was for someone to get hurt. P/O Merrell added that had he known that an accident had occurred, he would have stopped, rendered aid, and requested medical assistance. P/O Merrell acknowledged that he should have added additional information to the pursuit memorandums after learning that he had traveled farther than he initially thought, and he should have been more forthcoming by immediately informing his supervisors. P/O Merrell wished to add that he acknowledged this incident was a clear lack of judgement on his behalf and that he is truly sorry for what transpired.

According to computerized court records, on 11-27-18, Caliph Douglass pled guilty to the following: Robbery of a Motor Vehicle (F1), Aggravated Assault (F3), Fleeing or Attempting to Elude a Police Officer (F3). Caliph Douglass was sentenced to 5-10 years in prison followed by a period of five years probation.

James Clough
Lieutenant
Internal Affairs Division                    #127

Approved by:

Carol Abrams
Captain
Internal Affairs Division                    #54

14

## CONCLUSION:

This investigation has **SUSTAINED** the following violations of Police Department Directive 9.4 against P/O Dwayne Merrell #7078, PR# 227794, 16th District.

P/O Merrell was assigned to work the All-Terrain Vehicle (ATV) Enforcement Detail on 4-15-17. P/O Merrell was operating a BMW all-terrain motorcycle during the ATV detail. At approximately 1:05 PM on 4-15-17, personnel assigned to the ATV detail began following a green and white motorcycle being operated in the area of 5500 Chester Ave. The green and white motorcycle was violating motor vehicle code laws, as well as a city ordinance. At some point, P/O Merrell began a vehicular pursuit of the green and white motorcycle throughout various parts of Southwest Police Division and Upper Darby Township. **Directive 9.4 Section 1-B-2** states, "In all other circumstances initiating a vehicular pursuit is strictly prohibited. Accordingly, initiating a pursuit solely for stolen vehicles and traffic violations, including Driving Under the Influence (DUI), is strictly prohibited."

P/O Merrell failed to notify Police Radio that he had been in a pursuit of a motorcycle that left the City of Philadelphia and entered Upper Darby Township. **Directive 9.4 Section 3-N-1** states: "Sworn personnel in fresh and continuous pursuit may NOT pursue outside of the boundaries of Philadelphia unless permission is granted by a higher ranking supervisor."

The result of the vehicular pursuit was a collision between the fleeing motorcycle and two pedestrians in Upper Darby Township. The operator of the motorcycle, Caliph Douglass, fled from the collision on foot and carjacked a Nissan. P/O Merrell began a second vehicular pursuit of the fleeing stolen Nissan that was being operated by Caliph Douglass. At no time did P/O Merrell broadcast any information in reference to the carjacking and subsequent pursuit to Police Radio. P/O Merrell did not make any attempts to provide flash information nor notify the Upper Darby Police Department (UDPD) about the pursuit of the Nissan. P/O Merrell simply discontinued the pursuit and returned to his patrol duties once he re-entered the city. Furthermore, P/O Merrell failed to notify his supervisors that he had engaged in two vehicular pursuits and witnessed a robbery (carjacking). P/O Merrell waited until his supervisors had become aware of the incidents and P/O Merrell only reported that he had pursued the green and white motorcycle into Upper Darby Township. P/O Merrell failed to disclose the pursuit of the stolen Nissan to his supervisors.

This investigation has **SUSTAINED** the allegation of Falsification – Official Documents against P/O Dwayne Merrell #7078, PR# 227794, 16th District.

P/O Merrell engaged in two separate vehicular pursuits during one ongoing incident on 4-15-17. P/O Merrell initially pursued a green and white motorcycle that had violated a city ordinance and committed traffic infractions. The pursuit lasted approximately 10 minutes and covered a distance of several miles having traveled through various locations in Southwest Police Division and Upper Darby, PA. The operator of the green and white motorcycle was involved in a collision in Upper Darby, PA. After crashing the motorcycle into two pedestrians, the operator fled on foot and carjacked a Nissan and fled eastbound on Market St., in Upper Darby. P/O Merrell pursued the Nissan for several blocks.

15

P/O Merrell prepared a Philadelphia Police Department Pursuit Memorandum, as well as a Pennsylvania State Police Pursuit Report on 4-15-17. P/O Merrell reported on the Philadelphia Police Department Pursuit Memorandum that the pursuit of the green and white motorcycle lasted a duration of approximately "2" minutes and "8" city blocks.

When questioned by the assigned Internal Affairs investigator, P/O Merrell acknowledged that the pursuit lasted longer than he had reported on the reporting documents. P/O Merrell stated that he did not intentionally omit the information; although he realized he should have updated the memorandums to more accurately reflect the facts. P/O Merrell admitted he did not document the pursuit of the stolen Nissan on either the Philadelphia Police nor the Pennsylvania State Police forms.

The Philadelphia Police Pursuit Memorandum prepared and signed by P/O Merrell contained a checkbox indicating "NO" to the question of any police or civilians injured in a vehicular accident as a result of this pursuit. P/O Merrell denied seeing an accident, or collision occur, although he had become aware that there had been a collision involving the fleeing motorcycle and pedestrians prior to filling out the pursuit paperwork.

This investigation has **SUSTAINED** the allegation of Insubordination against P/O Dwayne Merrell #7078, PR# 227794, 16th District.

P/O Merrell worked an ATV Enforcement Detail on 4-15-17. At the beginning of the detail, P/O Merrell attended a roll call and received orders from the supervisors assigned to the detail. When interviewed by the assigned Internal Affairs investigator, Lt. Ruff and Lt. Frisco both explained that the officers, including P/O Merrell, were told that there would be no pursuits. Lt. Ruff explained that it had been repeatedly emphasized that pursuits were prohibited. Lt. Ruff handed out copies of relevant paperwork, including the Directives pertaining to pursuits and ATVs. Lt. Frisco stated that he told the officers short of witnessing a violent felony taking place they were not to pursue any vehicle during the detail.

Although having been told that pursuits were prohibited, absent witnessing a violent felony, P/O Merrell engaged in a pursuit of the green and white motorcycle that ultimately struck two pedestrians in Upper Darby Township.

This investigation has **SUSTAINED** the following violations of Police Department Directive 4.1 against P/O Dwayne Merrell #7078, PR# 227794, 16th District.

**Directive 4.1, Section 2. A-1&2** states, "The first police officer on the scene will: 1. Protect the entire scene and summon assistance necessary to perform the remaining duties. 2. Render first aid to the injured." On 4-15-17, P/O Merrell participated in a lengthy vehicular pursuit of a green and white motorcycle that began in the City of Philadelphia and eventually traveled into Upper Darby Township, PA. where the pursuit continued. The pursuit ended with a collision between the fleeing motorcycle and two pedestrians in the unit block of South 69th Street in Upper Darby PA. The collision was recorded on several surveillance cameras in the area.

16

Although P/O Merrell was a short distance away when the collision occurred, P/O Merrell drove his police motorcycle right past the scene of the collision and continued to travel northbound on 69th Street in the same direction as the male fleeing on foot. P/O Merrell made no efforts to render, nor summons medical aid for the victims. P/O Merrell took no initiative to protect the crime scene, nor did he request assistance from any emergency services personnel, regardless of what jurisdiction he believed he had been in. At the conclusion of P/O Merrell's pursuits, he simply returned to his normal patrol duties in the City of Philadelphia and did not report any of the unusual circumstances to anyone, including Upper Darby Township emergency personnel.

This investigation has **SUSTAINED** the allegation of Providing a False Statement to a supervisor during an investigation against P/O Dwayne Merrell #7078, PR# 227794, 16th District.

P/O Merrell had been engaged in a vehicular pursuit throughout portions of Southwest Philadelphia and into Upper Darby, PA, on 4-15-17. The pursuit ended in a collision between pedestrians and the motorcycle that P/O Merrell had pursued. After the collision, the male that had been operating the fleeing motorcycle carjacked a Nissan at 69th Street and Ludlow Street in Upper Darby, PA. P/O Merrell engaged in a vehicular pursuit of the stolen vehicle. P/O Merrell did not make an apprehension, nor recover the stolen vehicle. P/O Merrell simply returned to the City of Philadelphia and resumed his normal patrol duties.

Lt. Ruff had questioned P/O Merrell about what he believed had been P/O Merrell engaged in a fight with someone and the sirens he heard over the radio. Lt. Ruff asked P/O Merrell if he had been in a pursuit, P/O Merrell replied, "No." P/O Merrell told Lt. Ruff that he had followed the green and white motorcycle into the park and came out of the park on the Upper Darby side and could not see the motorcycle after that. Lt. Ruff said that he asked P/O Merrell if P/O Merrell had told him everything, P/O Merrell said, "Yes." Lt. Ruff asked P/O Merrell to tell him if there had been a pursuit, P/O Merrell assured Lt. Ruff that there had been no pursuit. At that time, Lt. Ruff was asked to call Police Radio and contact Delaware County. Lt. Ruff responded to 69th Street in Upper Darby and relayed information to Lt. Frisco. Lt. Ruff said that P/O Merrell denied that he saw the carjacking, nor pursued the carjacked vehicle.

Lt. Ruff was notified that there had been a severe collision and carjacking in Upper Darby and a Philadelphia police officer may have been involved in the chain of events. Lt. Ruff relayed the information to Lt. Frisco. Lt. Frisco questioned P/O Merrell and P/O Merrell told Lt. Frisco that the motorcycle had pulled into a wooded area in the park [Cobbs Creek Park] and P/O Merrell lost sight of the motorcycle and P/O Merrell turned around. P/O Merrell told Lt. Frisco that he never had gotten close enough to the motorcycle to initiate a traffic stop. Lt. Frisco asked P/O Merrell if he had chased the motorcycle, P/O Merrell told Lt. Frisco, "No." Lt. Frisco learned additional information from Lt. Ruff and Lt. Frisco called the entire ATV (ROC South) detail to a location and asked again if someone had pursued a motorcycle through Upper Darby, P/O Merrell came forward and admitted that he had engaged in the vehicular pursuit that traveled through Upper Darby.

Numerous video surveillance cameras that recorded portions of P/O Merrell pursuing the green and white motorcycle throughout Upper Darby, as well as the admissions during his Internal Affairs interview confirmed that portions of the information that P/O Merrell provided to his superiors were false and attempting to deceive.

This investigation has **SUSTAINED** the allegation of Failure to Supervise against Lt. Michael Frisco #419, PR# 250986. 14th District for failing to terminate P/O Merrell's pursuit.

Lt. Frisco (Sgt. Frisco at the time of this incident) had been assigned to supervise a contingent of officers working the ATV Enforcement Detail on 4-15-17. Lt. Frisco was the first person to spot the green and white motorcycle and call for the police dirt bikes to respond to the area of 55th St. and Chester Ave., at approximately 1:05 PM. Several units, both plainclothes and motorcycle officers, began following the motorcycle. P/O Merrell attempted to initiate a vehicle investigation of the motorcycle in the area of 59th St. and Cobbs Creek Parkway. The green and white motorcycle fled from police and P/O Merrell initiated a pursuit.

P/O Merrell periodically provided various locations to Police Radio between 1:20 PM and 1:26 PM, with his siren audible in the background. It should be noted that some radio transmissions were received and some were inaudible.

A review of the radio reproductions from Special Events 1 band on 4-15-17, clearly indicate that P/O Merrell had been pursuing the motorcycle and broadcasting some of his locations as he progressed. Lt. Frisco failed to recognize the pursuit, and take proactive and authoritative measures to stop P/O Merrell from continuing the pursuit.

This investigation has **SUSTAINED** the following violation of Police Department Directive 9.4 against Lt. Michael Frisco #419, PR# 250986, 14th District for recommending an action that violates Departmental policy.

At 1:23:32, Lt. Frisco broadcasted the following on Special Events 1 band, "We're not pursuing this dirt bike through the city here. Let's try to get a last location and try to box him in." Although Lt. Frisco stated that he asked P/O Merrell if he had chased the dirt bike and P/O Merrell denied it; Lt. Frisco had already acknowledged that he was aware that a pursuit had occurred by broadcasting that statement. The statement made by Lt. Frisco to "...box him in" is contradictory to the verbiage of **Directive 9.4 Section 3-O-1** that reads: "Fleeing vehicles will not be stopped under any circumstances by the following techniques: 1. Boxing-In-Surrounding the fleeing vehicles with police vehicles, which are then slowed to a stop with the fleeing vehicle."

Although Lt. Frisco explained that a particular method had been used in the past to accomplish a vehicle confiscation, suggesting that the officers utilize a method of "Boxing-In" could cause confusion and leave the officers in a position of violating policy and risk injury, or civil liability.

This investigation has **SUSTAINED** the allegation of Failure to Supervise against Lt. Joseph Ruff 330, PR# 217237, 12th District for failing to recognize the pursuit by P/O Merrell, and taking immediate corrective measures to clarify the recommendation of Lt. Frisco to "box in" the fleeing motorcycle.

18

When interviewed by the assigned Internal Affairs investigator, Lt. Ruff stated that he had been monitoring the Special Events 1 radio band during the ATV detail on 4-15-17. Lt. Ruff stated he had been monitoring the radio when the green and white dirt bike was first spotted in the area of 5500 Chester Ave. Lt. Ruff stated that he was aware that two different units were following the green and white dirt bike, Lt. Frisco and the unmarked BD team. Lt. Ruff was unaware that P/O Merrell had been pursuing the dirt bike until a later time.

Lt. Ruff told the assigned Internal Affairs investigator that he heard P/O Merrell and the siren from P/O Merrell's motorcycle and Lt. Ruff believed that P/O Merrell had been in a fight, or a foot pursuit. Although he believed that P/O Merrell may have been in danger, Lt. Ruff chose not to try to raise P/O Merrell by radio to determine the nature of the problem, nor the location of P/O Merrell for assistance.

Lt. Ruff heard Lt. Frisco broadcast the statement, "We're not pursuing this dirt bike through the city here. Let's try to get a last location and try to box him in." Lt. Ruff acknowledged that the suggestion that the dirt bike be boxed in was a misuse of the term as it referred to a tactic of getting sufficient manpower in hopes that an operator will surrender, or abandon a dirt bike to allow a confiscation. Lt. Ruff took no steps to correct the confusion that the term "Box him in" may have created.

This investigation has **SUSTAINED** the following violation of Police Department Directive 9.4 against PCD Iraida Delgado, PR# 233836, Police Radio and PCD Sara Mitchell, PR#286259, Police Radio.

PCD Delgado and PCD Mitchell were assigned to the console Special Event 1 on 4-15-17, working the ATV detail. At approximately 1:05 PM, on 4-15-17, Sgt. Frisco spotted a green and white motorcycle in the area of Allison Street and Vodges Avenue and requested units respond to the area. The motorcycle was lost in the area for several minutes and spotted again by plainclothes police. At approximately 1:18:50 PM, P/O Merrell, operating a police motorcycle began a pursuit of the green and white motorcycle in the area of 52nd Street and Warrington Avenue. P/O Merrell's sirens are clearly evident during the broadcasts. P/O Merrell made several additional broadcasts in which he provided other locations, still with a siren heard in the background. At 1:23:32, Sgt. Frisco broadcasted the following, "We're not pursuing this dirt bike through the city here. Let's try to get a last location and try to box him in." Sgt. Frisco's broadcast was an acknowledgement that there in fact had been an obvious pursuit.

At no time did PCD Delgado or PCD Mitchell acknowledge that P/O Merrell had engaged in a vehicular pursuit. PCD Delgado and PCD Mitchell failed to notify "J" Band, nor did either of them notify a Radio Room supervisor that an officer was in pursuit. Both PCD Mitchell and PCD Delgado knew that the Aviation Unit was assigned to the ATV detail and believed that the aircraft was unavailable at that time, they made no attempt to confirm the unavailability of the aircraft crew. According to **Directive 9.4 D-1-a -1,2,3**, "When a Police Radio dispatcher is notified that an officer is involved in a vehicular pursuit, the dispatcher will: 1) Immediately notify a Radio Room Supervisor and "J" band of the pursuit, 2) Contact and assign the initiating officer's direct supervisor or an available district supervisor to the pursuit, who shall then direct and control the pursuit and any apprehension efforts, 3) Notify the Police Aviation Unit if available,"

The allegation of a violation of a Special Unit / District S.O.P. (Standard Operating Procedure) is **SUSTAINED** against PCD Iraida Delgado, PR# 233836, Police Radio and PCD Sara Mitchell, PR# 286259, Police Radio.

PCD Delgado and PCD Mitchell, both experienced dispatchers, were assigned to the Special Event 1 band at Police Radio on 4-15-17, to work the ATV detail. Personnel assigned to the ATV detail in ROC South began following a green and white motorcycle from a plainclothes "burglary detail" vehicle at approximately 1:17:36, in the area of 52nd Street and Baltimore Avenue. At 1:20:01, a unit that identified themselves as 16M2 (P/O Merrell) broadcasted that the green and white motorcycle was at "59 and Cobbs...going into the woods." These broadcasts were followed by additional broadcasts, with sirens clearly audible in the background that covered a substantial geographical area in Southwest Police Division over approximately three and one half minutes.

When questioned by the Internal Affairs investigator, PCD Delgado stated that she was able to recall a green and white ATV being followed by police and the fact that the helicopter was down for service at the time. PCD Delgado stated she was unsure if the green and white ATV (motorcycle) was being pursued. PCD Delgado additionally said that she did not realize how much geographical area the green and white ATV (motorcycle) had traveled during the time it was followed by police and PCD Delgado claimed that she heard wind (wind distortion) and no sirens.

PCD Mitchell stated to the assigned Internal Affairs investigator that she heard someone say that they were behind a motorcycle and she heard wind and "swooshing." PCD Mitchell said that she made numerous attempts to obtain a location from the unit that was following the motorcycle, but she was unable to get a clear response. PCD Mitchell stated that she did not hear a siren.

Both PCD Mitchell and PCD Delgado are experienced dispatchers and should have recognized and acknowledged that a pursuit had been initiated. PCD Mitchell and PCD Delgado failed to recognize the pursuit and follow Police Radio SOP #210, Vehicle Pursuits. According to **Police Radio SOP #210, 1. A, B, C, D.** According to Police Radio SOP #210, "When Police Radio is notified of an officer in vehicular pursuit; which will also include the officer stating that they are "following" or "trying to stop" a vehicle, the Dispatcher will: A. Ask the officer if the vehicle is refusing to stop. B. Establish a reason for pursuit. C. Contact a patrol supervisor immediately. D. Notify a Radio Room supervisor immediately.

PCD Delgado stated that she was unsure if there had been a pursuit, and P/O Mitchell stated that she could not clearly hear due to background noise from the street unit. Both of the police supervisors assigned to the ATV detail in ROC South (Lt. Ruff and Lt. Frisco) recognized that P/O Merrell was actively engaged in a vehicular pursuit. Lt. Frisco broadcasted that the units were not to pursue the motorcycle all over the city and Lt. Ruff said that he became aware that P/O Merrell had been in a pursuit near the end of P/O Merrell's transmissions.

A copy of this report is to be sent to the Commanding Officer, Police Board of Inquiry for necessary action.

George J. Kappe
Inspector
Internal Affairs Division

21

# EXHIBIT B

 **PHILADELPHIA POLICE DEPARTMENT     DIRECTIVE 9.4**

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 06-16-16 |
| --- | --- | --- |

**SUBJECT:   VEHICULAR PURSUITS**
**PLEAC 4.2.1, 4.2.2**

---

1. **POLICY AND PURSUIT JUSTIFICATION**

   A. Policy

      1. The primary consideration when participating in or supervising any pursuit is the safety and welfare of the public, other officers, as well as the suspect(s). Every officer and supervisor must always weigh the benefits of immediate capture with the risks inherent to the pursuit itself.

   B. Justification for Initiating a Vehicular Pursuit

      1. An officer is justified in initiating a vehicular pursuit only when they are:

         a. In close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or

         b. In close proximity to a suspect vehicle and believes BOTH:

            1) The pursuit is necessary to effect the arrest or prevent escape, <u>AND</u>

*1
            2) The officer has <u>probable cause</u> to believe that the person being pursued has committed or attempted a forcible felony OR, has <u>probable cause</u> to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.

*2
      2. In all other circumstances initiating a vehicular pursuit is strictly prohibited. Accordingly, initiating a pursuit solely for stolen vehicles and traffic violations, including Driving Under the Influence (DUI), is strictly prohibited.

---

2. **DEFINITIONS**

   A. <u>Vehicular Pursuit</u> -  The use of a motor vehicle to chase, follow, or go after a vehicle that has refused to stop.

B. Forcible Felony - A felony involving actual or threatened serious bodily injury, which include:

Definitions Continued:

1. Murder,
2. Voluntary Manslaughter,
3. Arson Endangering Persons, and
4. Aggravated Assault Causing Serious Bodily Injury

The following felonies shall also be classified as "Forcible" when their commission includes actual or threatened force.  These include:

1. Rape,
2. Involuntary Deviate Sexual Intercourse,
3. Robbery, and
4. Kidnapping.

C. Deadly Weapon - Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury [18 Pa. C.S. 2301].

*5

**NOTE:** For the purposes of this directive, the suspect vehicle is excluded as a deadly weapon regardless of crime committed.

D. Serious Bodily Injury - Bodily injury, which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ [18 Pa. C.S. §2301].

E. Marked Radio Patrol Sedan – Standard four door marked police vehicle equipped with sirens and overhead lights, such as but not limited to District Patrol Vehicles (RPC), Highway Patrol Vehicle, Narcotics Vehicle, etc.

## 3.   GENERAL PURSUIT PROCEDURES AND GUIDELINES

A. Acknowledgment of a pursuit must be made by the District Patrol Supervisor or Police Radio.

B. If no District Patrol Supervisor acknowledges, Police Radio will assign a Supervisor to monitor and control the pursuit.  If the assigned Supervisor fails to acknowledge Police Radio, the Police Radio Room Supervisor will terminate the pursuit.

C. If a pursuit is initiated by a Special Unit and a Special Unit Supervisor is not available, Police Radio will assign the pursuit to a District Patrol Supervisor wherein the pursuit is happening.

D. If no justification for the pursuit is given by the initiating unit over Police Radio, it shall be the responsibility of all supervisors on the specific radio band, including the Police Radio Room Supervisor, to immediately terminate the pursuit. Also, any Supervisor is responsible for terminating a pursuit if they believe it has become too dangerous. The decision to terminate shall be final and not be subject to being countermanded.

E. A District Patrol Supervisor assigned to the area in which the pursuit is happening may, based upon his or her knowledge of the District, override any other outside supervisor monitoring and controlling the pursuit.

> **NOTE**: An "outside supervisor" is any supervisor not assigned to the district wherein the pursuit is happening.

F. During a pursuit, no more than two (2) marked radio patrol sedans will pursue a suspect vehicle (i.e. only the Primary and Secondary Units are permitted to engage in a pursuit and that no other vehicles will "caravan" behind the Secondary Unit).

G. Only sworn personnel may engage in a pursuit.

H. All other available sworn personnel (i.e. other than the Primary Unit, Secondary Unit, and Assigned Pursuit Supervisor) should be monitoring police radio and be prepared to stop or divert pedestrian or vehicular traffic that may be in the path of an oncoming pursuit in the areas of assignment. (e.g. Stopping cross traffic at a major intersection in the oncoming direction of a pursuit, etc.)

I. To lessen the possibility of a collision should the fleeing vehicle suddenly stop or change direction, a "safe distance" should always be maintained between the pursued vehicle, the Primary Unit, and Secondary Unit. A minimum of five (5) car lengths should always be maintained during any pursuit. However, a greater distance may be necessary based upon the speed of the pursuit, road and weather conditions, the suspect vehicle's behavior (i.e. how the vehicle is being operated, etc.), the Department's vehicle characteristics, officer's driving experience/capabilities, or any other circumstances that may exist.

J. All marked radio patrol sedans engaged in a pursuit must have, and will operate the police vehicle with emergency equipment activated continuously throughout the pursuit. This includes both light bars and red/blue lights and sirens.

> **NOTE**: Sworn personnel are reminded to use extreme caution when approaching any intersection during a pursuit and only proceed if clear of both vehicles and pedestrians.

**DIRECTIVE 9.4 - 3**

K. During a pursuit, sworn personnel involved will not switch to another radio band should the pursuit enter another division or jurisdiction. If radio contact is lost for any reason, the pursuit shall be terminated.

L. Once the Secondary Unit arrives to assist, the main function of the Primary Unit is the apprehension of the fleeing suspect(s). The Secondary Unit's main functions are as communications for and backup to the Primary Unit.

M. Only the Primary Unit, Secondary Unit, and the Directing Supervisor may leave their assigned area in response to the pursuit unless ordered not to do so by a higher-ranking officer. No other units may leave their assigned area unless ordered to do so.

\*3    N. In all inter-jurisdictional pursuits, the following actions will be taken by all Philadelphia Police personnel: (PLEAC 4.2.1)

1. Sworn personnel in fresh and continuous pursuit may NOT pursue outside of the boundaries of Philadelphia unless permission is granted by a higher ranking supervisor.

2. The initial pursuing officer will notify Police Radio when it is likely that a pursuit will continue into a neighboring jurisdiction. The exception is when the secondary unit arrives and takes over communications.

3. Police Radio will notify the neighboring jurisdiction of the pursuit as soon as possible.

4. When a pursuit is initiated by a law enforcement agency of another jurisdiction, Police Radio will notify the Patrol Supervisor who will immediately inquire into the circumstances surrounding the pursuit and what assistance is required by the pursuing agency,

5. Sworn personnel will not engage in pursuits initiated by other law enforcement agencies unless in accordance with all provisions of this directive. In the districts wherein a pursuit has been initiated by another law enforcement agency, Police Radio will assign the relevant District Patrol Supervisor to monitor and control Philadelphia Police Department personnel.

6. If an arrest is made outside of Philadelphia, but within the Commonwealth of Pennsylvania, the officer will transport the suspect(s) back to the Divisional Detective Headquarters. If an arrest occurs across any state line, the suspect(s) must go through the extradition procedures before being returned to Philadelphia.

**DIRECTIVE 9.4 - 4**

O. Fleeing vehicles will not be stopped under any circumstances by the following techniques:

1. Boxing-In – Surrounding the fleeing vehicles with police vehicles, which are then slowed to a stop with the fleeing vehicle.

2. Ramming – The deliberate act of hitting a fleeing vehicle with a police vehicle for the purpose of forcing the fleeing vehicle off the road or into a fixed object.

3. Roadblocks - The use of barricades, vehicles or other obstructions across a roadway to stop a fleeing vehicle.

\*3   4. Pursuit Termination Devices – The use of any pursuit termination or vehicle immobilization device (i.e, stop sticks, spike strips, etc.).  (PLEAC 4.22)

\*3   P. Vehicles, other than a marked Radio Patrol Car (i.e., unmarked cars, EPW, SUV, Motorcycle, etc.) shall not, barring exigent circumstances, initiate a vehicle pursuit. However, if a pursuit is initiated based upon exigent circumstances, the operators of these types of vehicles shall relinquish the position as Primary Vehicle to the first responding marked RPC and withdraw from the pursuit immediately.

Q. Police vehicles being used to transport any non-sworn personnel, including but not limited to, prisoners, witnesses, recruits, police explorers, or any "ride-along" shall not engage in a pursuit. Additionally, any unit containing a canine shall not engage in a pursuit.

R. Sworn personnel will immediately terminate any pursuit if the suspect vehicle enters an interstate highway or divided roadway in the wrong direction.

S. Under no circumstances will any sworn personnel involved in a pursuit discharge a firearm at any fleeing vehicle or the occupants of a fleeing vehicle.

T. Barring extenuating circumstances, all sworn personnel involved in a pursuit in any manner will complete and submit the relevant portion of both Pursuit Memoranda (city and state) found in Appendix "A" of this directive within three (3) days.

---

**4   SPECIFIC RESPONSIBILITES**

A. Initiating/Primary Unit

1. Determine the necessity of commencing or terminating a pursuit by considering:

   a. Whether justification to initiate the pursuit exists (refer to Section 1-B),
   b. Whether the suspect's identification and address are known, thereby making available an alternate means of arrest (e.g. via an arrest warrant),

**DIRECTIVE 9.4 - 5**

    c.  The weather and road conditions,
    d.  Location and population density (vehicular and pedestrian),
    e.  The capabilities and characteristics of the department vehicle,
    f.  The officer's own driving capabilities,
    g.  The officer's familiarity with the pursuit area,
    h.  Any other extraordinary circumstances or conditions (e.g. the proximity to school zones, playgrounds, shopping centers, etc.) and
    i.  The speed and control of the suspect vehicle.

2. If a pursuit is initiated, immediately inform the radio dispatcher of:

    a.  The fact that a pursuit has been initiated, along with the justification,
    b.  The initial location, direction, and estimated distance to the suspect vehicle,
    c.  The approximate speed of both the suspect and police vehicles,
    d.  The vehicle description and, if possible, license information and a physical and clothing description of the occupants along with approximate ages,
    e.  The continuous progress of the pursuit and if headed towards another district, division, or jurisdiction,
    f.  Upon arrival of a Secondary Unit, relinquish communication responsibilities to the Secondary Unit.

3. Continuously evaluate the benefits of an immediate capture against the safety of the public, other officers and the suspect.  An officer can self-terminate a pursuit at any time.

4. If ordered by a supervisor to relinquish the Primary Unit duties to another radio patrol sedan, immediately withdraw from the pursuit, return to area of assignment, and prepare to complete the relevant portion of the Pursuit Memoranda found in Appendix "A" of this directive.

5. Apprehend the suspect(s), or by ensuring that only the proper amount of force is used to make any arrests consistent with the guidelines in directive 10.2, "Use of Moderate/Limited Force".  If the vehicle is stopped and the occupant(s) appear to barricade themselves inside the vehicle, ensure the provisions found in Directive 10.7, "Crisis Response/Critical Incident Negotiations," regarding barricaded persons are implemented.

6. If the Initiating/Primary Unit loses sight of the suspect vehicle, terminate the pursuit immediately and notify Police Radio.  Begin a search of the area where suspect vehicle was last seen as directed by the responding supervisor.

7. If any supervisor terminates the pursuit, disengage from the pursuit immediately, safely stop and park the vehicle, notify police radio of location and odometer mileage, update patrol log, and await the arrival of a supervisor.

8. Upon the arrival of the Aviation Unit helicopter, the Initiating/Primary Unit's duty shall shift to the apprehension of the occupants coordinated with the helicopter flight crew.  Thus, once the Aviation Unit has arrived and assumed the pursuit, the Initiating/Primary Unit shall immediately withdraw from the pursuit and:

   a. Return to a safer driving speed,
   b. Move out of sight of the fleeing vehicle,
   c. Continuously monitor Police radio as to the direction of the fleeing vehicle,
   d. Not renew pursuit of the fleeing vehicle if they should make subsequent visual contact and are in close proximity with it, and
   e. Be prepared for any reports by the flight crew that the fleeing vehicle has stopped and the suspect(s) have fled on foot.

9. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

B. Secondary Unit

1. Upon joining the Primary Unit, acknowledge to Police Radio as the "Secondary Unit".

2. Maintain visual contact with the primary unit and assume all communication responsibilities such as, reporting the continuous progress of the as indicated in Section 4-A-2, c through f of this directive.

3. If ordered by a supervisor, relinquish the Secondary Unit duties to another vehicle, immediately withdraw from the pursuit, and return to area of assignment.

4. Do not pass the Primary Unit unless requested to do so by that Unit or if other conditions exist, such as mechanical malfunction, etc.

5. Back-up and support the Primary Unit officer(s) consistent with Section 4-A-5 of this directive.

6. If either the primary unit or any supervisor/commander terminates the pursuit, immediately cease the pursuit.

7. Upon the arrival of the Aviation Unit helicopter, the secondary unit's duty shall be consistent with Section 4-A-8 of this directive.

8. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

**DIRECTIVE 9.4 - 7**

C. Assigned Pursuit Supervisor shall:

   1. Direct and control the pursuit and apprehension efforts by:

      a. Evaluating the Primary/Initiating Unit's justification for commencing and continuing the pursuit,

      b. Immediately terminating the pursuit, if necessary, considering all the facts and circumstances including, but not limited to, those factors identified in Section 4-A-1 of this directive,

      c. Ensuring the Aviation Unit was notified,

      d. Ensuring the Primary Unit and the Secondary Unit withdraw from the pursuit if Aviation Unit assumes the pursuit and that  pursuit and that they comply with the provisions of Section 4-A-8 and 4-B-7 of this directive respectively.

      e. Monitoring all radio transmissions, and ensuring Police Radio is kept informed of location, direction, speed, weather and road conditions, vehicle and pedestrian traffic, etc.

      f. Limiting the involvement and radio use by other units.

      g. Coordinating other units to respond to strategic locations to possibly apprehend the suspects,

      h. Arriving at the scene of any apprehension as soon as possible to ensure the provisions of Directive 10.2, regarding the use of force and, if necessary, Directive 10.7 regarding barricaded persons are strictly observed.

   2. If the pursuit was terminated by any supervisor, meet the Primary Unit and Secondary Units and inspect the vehicle odometers, sign officer's log noting location, odometer mileage, and mileage recorded by Police Radio.

   3. After any pursuit, if appropriate, make sure officers have sufficient time to calm down and regain their composure before returning to patrol.

   4. Supervisors must be proactive at the end of the pursuit to ensure that arrests are made in accordance with departmental policy.  Supervisors will be held accountable if they fail to take appropriate action.

   5. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

D.  Police Radio Responsibilities

   1.  Police Radio Dispatcher

      a.  When a Police Radio Dispatcher is notified that an officer is involved in a vehicular pursuit, the dispatcher will:

         1)  Immediately notify a Radio Room Supervisor and 'J' band of the pursuit,

         2)  Contact and assign the initiating officer's direct supervisor or an available district supervisor to the pursuit, who shall then direct and control the pursuit and any apprehension efforts,

         3)  Notify the Police Aviation Unit if available,

         4)  Monitor and broadcast the relevant information received from the Initiating/Primary Unit,

         5)  Once a Secondary Unit has joined in the pursuit, use the Secondary Unit as the communications vehicle unless the Primary Unit is a two-officer vehicle,

         6)  If the pursuit is terminated by any supervisor, request the location and odometer mileage from the terminated unit and dispatch a supervisor to that location,

         7)  Assign a separate District Control Number for every pursuit.

   2.  Radio Room Supervisor Responsibilities

      a.  Upon being notified by a Police Dispatcher of a pursuit, the Radio Room Supervisor:

         1)  Will physically respond to the involved console and begin monitoring the pursuit ensuring all responsibilities of the Police Dispatcher in Section 4-D-1 are completed,

         2)  If no justification for the pursuit is given by the initiating unit or if the initiating unit's supervisor or available district supervisor fails to respond to Police Radio, will immediately terminate the pursuit,

            **NOTE**: If a pursuit is terminated because the initiating unit's supervisor or available District Supervisor failed to respond, the appropriate supervisor's Commanding Officer, Divisional Inspector and the Regional Operations Command will be notified via a Blackberry message.

**DIRECTIVE 9.4 - 9**

3) Ensure the notification of Aviation Unit and their availability.

4) When the pursuit results in an auto accident or injury to police or the suspect vehicle, the Pursuit Broadcast Tapes will be forwarded to the appropriate Commanding Officer.

5) Will generate a daily report of all pursuits, along with a printed copy of all radio transmissions of the pursuit, to the appropriate Commanding Officer for immediate action.

E. Aviation Unit Personnel

1. If the Aviation Unit takes over an **ACTIVE** pursuit, the Tactical Flight Officer (TFO) will:

   a. Advise Police Radio that they have assumed the pursuit **as the primary unit**.

   b. Ensure that the helicopter and other conditions are safe to continue the pursuit, such as available fuel and weather conditions, etc.,

   c. Broadcast the direction of the fleeing vehicle to allow officers on the ground to prepare to make an apprehension when the vehicle has stopped and the suspect(s) have fled on foot as per Section 4-A-8 and 4-B-7 of this directive.

2. If a **supervisor TERMINATES a pursuit** for any reason, Aviation Unit personnel will also terminate the pursuit.

3. In the event that the suspect vehicle is later discovered by the Aviation Unit, the Tactical Flight Officer (TFO) will make the proper notifications in an attempt to effect an arrest or to guard the suspect vehicle for prints.

F. District/Unit Commanders

1. Will continuously assess the decisions of the assigned supervisor and take control/action if necessary considering all the facts and circumstances including, but not limited to, the factors identified in Section 4-C-1-b of this directive.

2. Shall ensure that copies of the Pursuit Memoranda (city and state) found in Appendix "A" of this directive, the Pursuit Report generated by Police Radio and the radio transmissions are forwarded to the appropriate Deputy Commissioner and the Commanding Officer of the Police Academy, Accident Prevention Section within five (5) calendar days of the pursuit date.

**DIRECTIVE 9.4 - 10**

*6

3. The District/Unit Commanders should ensure a copy of the Pennsylvania Police Pursuit Report is forwarded to the Research and Analysis Unit, on the first business day after the pursuit.  The original PSP Report will be submitted with the pursuit packet through the chain of command.  This is further detailed in Appendix "A" page 6, of this directive.

4. Shall ensure the appropriate actions, up to and including formal disciplinary recommendations (75-18s), are taken against any subordinate who has violated any provision of this directive.

G. Appropriate Deputy Commissioner

1. Shall review the Pursuit Memoranda, the Pursuit Report generated by Police Radio and the radio transmissions to ensure that officers and supervisors comply with the procedures and policies set forth in this directive.

| **RELATED PROCEDURES:** | Directive 9.7, | Safe Operation of Police Vehicles |
| | Directive 10.2, | Use of Moderate/Limited Force |
| | Directive 10.7, | Crisis Response/Critical Incident Negotiations |
| | Disciplinary Code | |

## BY COMMAND OF THE POLICE COMMISSIONER

| **FOOTNOTE #** | **GENERAL #** | **DATE SENT** | **REVISION** |
|---|---|---|---|
| *1 | 2450 | 01-14-09 | Clarification |
| *2 | 4193 | 01-16-09 | Deletion of 1-B-1-b-3 |
| *3 | 4830 | 08-18-15 | Additions/Changes |
| *4 | 1141 | 09-01-15 | Change |
| *5 | 1023 | 04-29-16 | Changes |
| *6 | 4131 | 06-16-16 | Addition |

**DIRECTIVE 9.4 - 11**

 **PHILADELPHIA POLICE DEPARTMENT**   **DIRECTIVE 9.4**

**APPENDIX "A"**

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 04-29-16 |
| --- | --- | --- |

**SUBJECT:  POLICE VEHICLE PURSUIT MEMORANDUM**

This memorandum is to be completed regardless of whether or not the violator is apprehended, the length, or duration of the pursuit, or whether or not an accident had taken place.

A copy of the Complaint or Incident Report (75-48) will be included with this memorandum. When available and appropriate, a copy of Accident Report (AA-500 or 75-48C) will accompany it.  It is very important that any vehicle accident involving a police vehicle, the fleeing vehicle, any other civilian or city-owned vehicle or any combination thereof ,be described not only in the AA-500 or 75-48C and the 75-48, but also in this Pursuit Memorandum and the Pennsylvania Police Pursuit Report.

*3/*4
*5
This memorandum must be submitted through the chain of command for review to the Police Academy, Accident Prevention Section within thirty days.  The Police Academy will retain copies of all State Police Pursuit Reports and AA-500 or 75-48Cs.  The Commanding Officer of the initiating district/unit must ensure that the State Police Pursuit Report is sent to the Research and Analysis Unit.

MEMORANDUM

TO        : CHIEF INSPECTOR, TRAINING BUREAU
FROM    :
SUBJECT: PHILADELPHIA POLICE DEPARTMENT PURSUIT MEMORANDUM

DATE OR OCCURRENCE   TIME OF OCCURRENCE_____DAY_____

DISTRICT OF OCCURRENCE ____DIST. CONTROL NUMBER_____

LOCATION PURSUIT INITIATED_____ _____

LOCATION PURSUIT TERMINATED_____

NUMBER OF POLICE UNITS INVOLVED_____

DURATION OF PURSUIT (MINUTES)____DISTANCE (CITY BLOCKS)_____

JUSTIFICATION FOR PURSUIT AND SPECIFIC VIOLATIONS_____

_____

VIOLATIONS DURING PURSUIT_____

TRAFFIC CONDITIONS (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

PEDESTRIAN TRAFFIC (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

WEATHER CONDITIONS (CIRCLE ONE):

1 - NO ADVERSE CONDITIONS
2 - RAINING
3 - SLEET, HAIL, FREEZING RAIN
4 - SNOWING
5 - FOG AND SMOKE
6 - RAIN AND FOG

ROAD CONDITIONS (CIRCLE ONE): DRY WET SNOW COVERED ICE COVERED

PRIMARY UNIT  NAME AND RANK OF OFFICER_____

BADGE #_____PAYROLL #--------------------------

DISTRICT OR UNIT/SQUAD AND GROUP___APPOINTMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE_____

SECONDARY UNIT: NAME AND RANK OF OFFICER_____

BADGE#_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____APPOINMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____ PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE

**DIRECTIVE 9.4 - 2**
**APPENDIX "A"**

VIOLATOR'S VEHICLE: MAKE____MODEL_____YEAR_____

COLOR___TAG_____OPERATOR'S NAME_____
DATE OF BIRTH_____ADDRESS_____

CITY/STATE_____

VIOLATOR'S CHARGES_____

OWNER OF VEHICLE_____

PRIMARY OFFICER'S NARRATIVE:  Outline the specifics of the pursuit, including justification. (Use 8" x 11" sheet of white paper should additional space be required.

_____

_____

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SECONDARY OFFICER'S NARRATIVE:  Outline the specifics of your involvement in the pursuit.  (Use 8" x 11" sheet of paper should additional space be required.)

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SUPERVISOR MONITORING PURSUIT: NAME/RANK_____

**DIRECTIVE 9.4 - 3**
**APPENDIX "A"**

DISPOSITION OF PURSUIT: PURSUIT TERMINATED  YES___  NO___

 (IF YES BY WHOM) NAME/RANK_____

REASON FOR TERMINATION: EXPLAIN_____

_____

_____

ANY MOTOR VEHICLE ACCIDENTS AS A RESULT OF THIS PURSUIT? YES__ NO__

(THIS INCLUDES ALL POLICE VEHICLES, THE FLEEING VEHICLE, AND OTHER
CIVILIAN OR CITY-OWNED VEHICLES THAT MAY HAVE BECOME INVOLVED IN
AN ACCIDENT AS A DIRECT OR INDIRECT RESULT OF THE POLICE PURSUIT.)
(IF YES, EXPLAIN AND ATTACH COPY OF THE 75-48, AND WHEN AVAILABLE, AN
AA-500 OR 75-48C)

_____

_____

ANY POLICE OR CIVILIANS INJURED IN A VEHICULAR ACCIDENT AS A RESULT OF
THIS PURSUIT?  YES__ NO__  (IF YES, EXPLAIN AND GIVE EXTENT OF INJURIES.)
_____

_____

ANY POLICE OR CIVILIAN DEATHS AS A RESULT OF THIS PURSUIT?
YES__ NO _____

IF YES, EXPLAIN_____

_____

_____

ANY VIOLATIONS OF DIRECTIVE 41? YES___  NO___

 (IF YES, EXPLAIN)_____

_____

**DIRECTIVE 9.4 - 4**
**APPENDIX "A"**

SUPERVISOR'S NARRATIVE: PER DEPARTMENT POLICY, WAS THIS PURSUIT
JUSTIFIED?  YES___  NO___ EXPLAIN AND INCLUDE RECOMMENDATIONS
_____

_____

_____

_____

SUPERVISOR'S SIGNATURE_____BADGE #_____DATE_____

DISTRICT COMMANDING OR COMMAND INSPECTIONS BUREAU COMMENTS:
(Per Department policy, was this pursuit justified?) YES__ NO__

RECOMMENDATIONS_____

_____

_____

_____

COMMANDING OFFICER'S SIGNATURE_____ DATE_____

*5   INSPECTOR'S
RECOMMENDATIONS_____

_____

_____

INSPECTOR'S SIGNATURE_____ DATE_____

*5   CHIEF INSPECTOR'S
RECOMMENDATIONS_____

_____

_____

CHIEF INSPECTOR'S SIGNATURE_____ DATE_____

**DIRECTIVE 9.4 - 5
APPENDIX "A"**

*5    DEPUTY COMMISSIONER'S
      RECOMMENDATIONS_____

      _____

      _____

      _____

      DEPUTY COMMISSIONER'S SIGNATURE_____ DATE_____

      ACCIDENT PREVENTION SECTION:

      DATE RECEIVED_____BY WHOM_____

      RECOMMENDATIONS:_____

      _____

      _____

      TRAINING BUREAU CHIEF'S ACKNOWLEDGEMENT:
      (Per Department policy, was this pursuit justified?) YES___ NO___

                              _____
                              CHIEF INSPECTOR'S SIGNATURE

                              DATE_____

## PENNSYLVANIA POLICE PURSUIT REPORT

Act 154 of 1994 requires police departments in Pennsylvania to make a record of all vehicle pursuits and to report them to the Pennsylvania State Police. The Pennsylvania State Police is required to collect these reports, and to compile an annual summary of information to be reported to various entities. Completion and submission of this form for all pursuits, which occur on or after January 1, 1996, will ensure compliance with the reporting requirements of Act 154.

The detailed information collected through the use of this form will be used to help identify both positive and negative factors influencing the outcome of vehicular pursuits, validate or refute the merits of pursuit policies and apprehension techniques, and to recognize training successes and deficiencies. It is intended that this will enable police departments throughout the Commonwealth to enhance the safety of their officers and the public they serve.

**DIRECTIVE 9.4 - 6**
**APPENDIX "A"**

The form should be completed by either the primary pursuing police officer or their supervisor, at the discretion of the individual police department. It has been designed to be completed and read without the need for code sheets or overlays. The form may also be completed by agencies assisting the primary pursuing agency. Forms completed by assisting agencies shall not be submitted to the Pennsylvania State Police.

*3/*4   The Commanding Officer of the initiating district/unit shall ensure that original, completed forms are submitted directly to the Research and Analysis Unit as soon as possible. The Research and Analysis Unit shall submit it to the Pennsylvania State Police, upon receipt from the Commanding Officer of the initiating district/unit. Blank forms may be duplicated as necessary. Only original, completed forms shall be submitted to the Pennsylvania State Police. Copies should be made for your records.

Questions concerning the completion of this report should be directed to:

Pennsylvania State Police
Bureau of Research and Development
1800 Elmerton Avenue
Harrisburg, PA   17110
ATTN: Pursuit Reporting Coordinator
(717) 783-5536

## BLOCK INSTRUCTIONS

1. REPORTING AGENCY:  Enter the name of the reporting agency.  For agencies having stations at multiple locations, also list the location.

2. REPORTING OFFICER:  Enter the full name of the individual preparing the report.

3. SIGNATURE:  Self-explanatory.

4. INCIDENT NUMBER:  Enter the Incident Number (or case number, etc.) your agency assigns the incident.  If an additional vehicle(s) is actively pursued as part of the same incident, that pursuit shall be reported on a separate form, with a supplemental incident number, e.g., A01123456A.

   PSP: Enter the Incident Number as follows: A01123456, S13123456

5. PURSUIT DATE: Enter the date the pursuit began in the following format:

   010296 for January 2, 1996

6. PURSUIT TIME: Enter the time (24 hour clock) the pursuit began.

7. SUPERVISOR'S INITIALS AND BADGE NO.: Self-explanatory.

8. JURIS NUMBER:  Enter the Juris Number assigned by the Pennsylvania State Police in the five boxes of the block.  If your department has not been assigned a Juris Number, contact the Pennsylvania State Police, Bureau of Research and Development, Management Information and Uniform Crime Reporting Section, at (717) 783-5536.

   PSP:   Use the appropriate Station Code, preceded by the number 9 (i.e., 91110 would be entered for Greensburg, Station Code 1110).

9. REASON INITIATED:   Mark the choice which best describes the offense or suspected offense for which the officer INITIALLY decided to pursue the vehicle.  If more than one choice applies, mark the most serious.  Use only an offense known or suspected at the time the attempt to stop was initiated.

   EXAMPLE:   If a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked.  If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked.

   DUI OR SUSPECTED - The driver was known to be or suspected of Driving Under the Influence.

   OTHER TRAFFIC - Any other traffic violation.

   SUMMARY CRIMINAL - Any known or suspected summary criminal offense.

   MISDEMEANOR CRIMINAL - Any known or suspected misdemeanor criminal offens

   FELONY CRIMINAL - Any known or suspected felony criminal offense, except those relating to the vehicle known to be or suspected of being stolen.

   STOLEN OR SUSPECTED - The vehicle is known or suspected to be stolen.

10. TYPE VEHICLE PURSUED:   Mark the choice, which best described the vehicle pursued.

   AUTOMOBILE - Passenger cars and mini-vans regardless of the manner in which they are registered.

   VAN/PICK-UP/SUV - Full size vans, all pick-up trucks, and sport utility vehicles, even though they may be registered as station wagons.

   MOTORCYCLE - All two-wheeled motorcycles, mopeds, motor-driven pedacycles.

   OTHER - All other vehicles.

**DIRECTIVE 9.4 - 8**
**APPENDIX "A"**

11. APPREHENSION: Mark the choice which best describes the apprehension, if any, of the violator.

NONE - VIOLATOR SUCCESSFULLY ELUDED POLICE - Self-explanatory.

NONE - DECISION MADE TO TERMINATE - The pursuit was terminated due to a decision made by the pursuing officer(s) or a supervisor, even though officer(s) were able to continue the pursuit.

NONE - STOPPED, BUT ESCAPED ON FOOT - The pursuit resulted in the violator vehicle being stopped, but the violator escaped on foot.

APPREHENDED DURING PURSUIT - The violator was apprehended during pursuit. This includes during any foot pursuit or search conducted as an immediate continuation of the original pursuit.

DELAYED - AFTER TERMINATION OF PURSUIT - The violator is apprehended after the pursuit is terminated. This includes cases in which the violator is identified through investigation, or if the violator is identified during the pursuit, the decision is made to terminate the pursuit and apprehend the violator at a later time.

12. REASON TERMINATED - Mark the choice which best describes the reason for termination of the pursuit.

PURSUIT DISCONTINUED - Use if the pursuit was terminated by a decision to discontinue.

POLICE ACCIDENT - The pursuit was terminated because the pursuing police vehicle was involved in an accident.

POLICE VEHICLE DISABLED - The pursuit was terminated because the pursuing police vehicle suffered a mechanical failure other than that caused by an accident or collision.

VIOLATOR STOPPED VOLUNTARILY - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, and surrendered.

VIOLATOR ABANDONED VEHICLE - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, then fled on foot.

VIOLATOR STOPPED BY COLLISION OR ACCIDENT - The violator was involved in a collision or accident, which terminated the pursuit.

**DIRECTIVE 9.4 - 9**
**APPENDIX "A"**

VIOLATOR VEHICLE DISABLED - The pursuit was terminated because the violator vehicle suffered a mechanical failure other than that caused by an accident or other police action.

STOPPED BY OTHER POLICE ACTION - The violator was stopped by apprehension techniques other than trailing pursuit, e.g., roadblock, induced stop, etc.

13. COLLISION TYPE: Mark the choices, which describe any collisions occurring during the pursuit.

NO COLLISION – Self-explanatory.

VIOLATOR ACCIDENT - If an accident occurs involving only the violator vehicle.

POLICE ACCIDENT - If an accident occurs involving only a pursuing police vehicle.

UNINVOLVED ACCIDENT - If an accident occurs involving only a vehicle or vehicles not involved in the pursuit, and the accident is a result of the actions of either the violator or police vehicles, e.g., the violator forces an uninvolved vehicle off the road.

VIOLATOR - POLICE ACCIDENT - If an accident occurs involving the violator and pursuing police vehicles.

VIOLATOR - UNINVOLVED ACCIDENT - If an accident occurs involving the violator vehicle and an occupied vehicle not involved in the pursuit.

UNINVOLVED - POLICE ACCIDENT - If an accident occurs involving an occupied vehicle not involved in the pursuit and a pursuing police vehicle.

VIOLATOR - POLICE DEL. INT. (Deliberate intent) - If the violator vehicle was deliberately driven into a police vehicle.

VIOLATOR - UNINVOLVED DEL. INT. - (Deliberate intent) - If the violator vehicle was deliberately driven into an uninvolved vehicle.

POLICE - VIOLATOR LEGAL INTER. (Legal Intervention) - If a police vehicle was deliberately driven into the violator vehicle as an act of legal intervention.

14. APPREHENSION TECHNIQUES:

USED: Mark each apprehension technique used during the pursuit.

END PURSUIT:  Mark one technique most responsible for ending the pursuit, if the violator vehicle was stopped.

TRAILING PURSUIT - Following the violator vehicle in an attempt to stop it.

ROAD SPIKES - Road Fangs, Spike Strips, Stop Sticks, or other devices designed to deflate the tires of a pursued vehicle.

PARTIAL ROADBLOCK - A roadblock intended to stop or slow the pursued vehicle while allowing the vehicle to pass through or around the roadblock.

TOTAL ROADBLOCK - A roadblock, which completely blocks the pursued vehicle's path, preventing the vehicle from passing through or around the roadblock without striking the roadblock.

ROLLING ROADBLOCK - One or more police vehicles being driven in front of, and in the same direction as, the pursued vehicle. The police vehicles are then slowed to force the violator vehicle to stop.

OTHER INDUCED STOP - One or more police vehicles being used to force the pursued vehicle to stop. For the purposes of this report, in an induced stop, there is no attempt to make contact with the pursued vehicle.

LEGAL INTERVENTION - For the purposes of this report, deliberately driving a police vehicle into the violator vehicle in an attempt to stop the vehicle.

FIREARMS - Firearms or long guns discharged at the pursued vehicle or driver.

AIR SUPPORT - Assistance is provided by any type of aircraft.

15. NONPURSUIT RELATED CHARGES:   List the charges filed against the operator and occupants of the pursued vehicle, which are not a result of their conduct during the pursuit, if they are apprehended during the pursuit. This includes charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9. If there are more than four, list the four most serious charges here. Charges filed in another state should be entered as if they were filed in Pennsylvania. Check the appropriate space if there are additional non-pursuit-related charges and list them in the continuation/synopsis.

EXAMPLE:     A violator is the subject of an outstanding warrant for burglary and criminal trespass. During the pursuit, the violator attempts to ram a pursuing police vehicle. The violator is apprehended during the pursuit, and a search of the vehicle, incident to the violator's arrest, reveals illegal drugs. CC3502 and CC3503 would be entered in this block (CC2702, aggravated assault, would be entered under Pursuit Related Charges, and the drug violations would be listed under Other Pursuit Related Charges.)

In the first two blocks, enter one of the following codes:

CC - Crimes Code
CS - Controlled Substance, Drug, Device and Cosmetic Act
FW - Fireworks Law
GM - Game Law
LL - Liquor Law
VC - Vehicle Code

In the next four blocks, enter the section number. For violations of the Controlled Substance, Drug, Device, and Cosmetic Act, delete the (a). Section 13(a)30 would be coded as 1330.

16. ROAD SURFACE:   Mark the choice which best described the condition of the road surface during the pursuit.

17. VISIBILITY:   Mark the choice which best described the visibility conditions during the pursuit.

DAY/CLR - Daylight, with no atmospheric obscurement, such as fog, rain, snow, etc.

DAY/OBSC - Daylight, with atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/CLR - Dusk or dawn, with no atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/OBSC - Dusk or dawn, with atmospheric obscurement, such as fog, rain, snow, etc.

DARK/CLR - Dark, with no atmospheric obscurement, such as fog, rain, snow, etc.

DARK/OBSC - Dark with atmospheric obscurement, such as fog, rain, snow, etc.

18. MISC:

PRIMARY PURSUING AGENCY - Mark this if your agency was the primary pursuing agency during the pursuit.

ASSISTING AGENCY - Mark this if your agency was assisting the primary pursuing agency. Only the primary pursuing agency is required to forward this report to the Pennsylvania State Police.

PSP - This report shall be forwarded in accordance with applicable directives regardless of the status of the Pennsylvania State Police as either the primary pursuing agency or an assisting agency.

**DIRECTIVE 9.4 - 12**
**APPENDIX "A"**

PROBABLE USE DRUGS/ALCOHOL - Mark this if it is suspected that the violator is suspected of being under the influence of drugs or alcohol, regardless of whether charges relating to the use of drugs or alcohol are filed.

PURSUED VEH. OPPOSE TRAFFIC - Mark if the pursued vehicle was driven on a one-way roadway against the normal flow of traffic.

POLICE VEH. OPPOSE TRAFFIC - Mark if any police vehicle actively pursuing the violator was driven on a one-way roadway against the normal flow of traffic.

NOTE: If a police vehicle were driven on a one-way roadway against the normal flow of traffic while not actively pursuing the violator, such as to take a position at a roadblock, this block would not be completed.

19. PURSUIT-RELATED CHARGES:   Mark all the charges resulting from the violator's operation of the pursued vehicle during the pursuit.

20. OTHER PURSUIT RELATED CHARGES:   Enter any other charges resulting from the violator's operation of the pursued vehicle during the pursuit.

21. HIGHWAY:   Mark the type of highway(s) on which the pursuit started, traveled on during the pursuit, and on which the pursuit ended.

22. AREA: Mark the type of area(s) in which the pursuit started, traveled through, and ended.

| | |
|---|---|
| URBAN/BUS | -Urban area or business district |
| SUBURBAN | -Self-explanatory |
| RESIDENTIAL | -Self-explanatory |
| RURAL | -Self-explanatory |

BLOCKS 23 THROUGH 37 - Enter three digits, e.g., enter three as 003, ten as 010, etc.

23. MARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of marked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

24. UNMARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of unmarked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

25. VIOLATOR INJURIES:   Enter the number of persons in the violator vehicle who received injuries resulting from vehicular operation during the pursuit.

**DIRECTIVE 9.4 - 13**
**APPENDIX "A"**

26. POLICE INJURIES:   Enter the number of persons in police vehicles who received injuries resulting from vehicular operation during the pursuit.

27. UNINVOLVED INJURIES:   Enter the number of uninvolved persons who received injuries resulting from vehicular operation during the pursuit.

28. VIOLATOR DEATHS:   Enter the number of persons in the violator vehicle who were killed as a result of vehicular operation during the pursuit.

29. POLICE DEATHS:   Enter the number of persons in police vehicles who were killed as a result of vehicular operation during the pursuit.

30. UNINVOLVED DEATHS:   Enter the number of uninvolved persons who were killed as a result of vehicular operation during the pursuit.

31. VIOLATOR PROPERTY DAMAGE:   Enter the estimated amount of property damage to the violator's vehicle resulting from the pursuit.

32. POLICE PROPERTY DAMAGE:   Enter the estimated amount of property damage to police vehicles resulting from the pursuit.

33. UNINVOLVED PROPERTY DAMAGE:   Enter the estimated amount of property damage to uninvolved property resulting from vehicular operation during the pursuit.

34. NUMBER OF PERSONS IN PURSUED VEHICLE: Self-explanatory.

35. PERSONS IN PURSUED VEHICLE ARRESTED: Self-explanatory.

36. LENGTH OF PURSUIT (MILES): Self-explanatory.

37. TIME ELAPSED DURING PURSUIT (MINUTES): Self-explanatory.

38. VEHICLE: Enter the pertinent information concerning the pursued vehicle.

39. VIOLATOR: Enter the pertinent information concerning the pursued subject.

40. CONTINUATION/SYNOPSIS: Self-explanatory.


PENNSYLVANIA POLICE PURSUIT REPORTING SYSTEM
COMMON REPORTING ERRORS

Block 8  (JURIS NUMBER)
This block must be completed.   If you don't know this number, you can obtain it from the person in your department who submits Uniform Crime Report information to the Pennsylvania State Police, or call the number listed below.

Block 9 (REASON INITIATED)
Mark ONLY ONE selection.  If two or more selections could be made, mark only the most serious.  For example, if a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked.  If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked.  Selection should usually agree with non-pursuit-related charges in block 15.

Blocks 10 (TYPE VEHICLE PURSUED), 11 (APPREHENSION), 12 (REASON TERMINATED)
        Mark only one selection in each block.

Block 13 (COLLISION TYPE)
        More than one selection may be marked.

Blocks 11 (APPREHENSION), 39 (VIOLATOR)
If a violator is identified in Block 39, some type of apprehension should be indicated in Block 11.

Block 14 (APPREHENSION TECHNIQUES)
There may be more than one selection made under USED.  No more than one selection may be made under END PURSUIT.

One selection under END PURSUIT must be marked, unless NONE-VIOLATOR SUCCESSFULLY ELUDED POLICE or NONE-DECISION MADE TO TERMINATE or DELAYED - AFTER TERMINATION OF PURSUIT are marked in block 11 (APPREHENSION).

Also, OTHER INDUCED STOP refers to one or more police vehicles being used to force the pursued vehicle to stop.  It does not include TOTAL ROADBLOCK, ROLLING ROADBLOCK, and LEGAL INTERVENTION (in legal intervention, a police vehicle is deliberately driven into the pursued vehicle.

Block 15 (NONPURSUIT-RELATED CHARGES), 20 (PURSUIT-RELATED CHARGES)
        Listing charges:

        RIGHT      WRONG
        VC 1543    75 1543

Blocks 15, 19, 20 (NONPURSUIT AND PURSUIT-RELATED CHARGES)
If suspect was not apprehended, no charges should be indicated in Blocks 15, 19, or 20.

Include charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9.

**DIRECTIVE 9.4 - 15**
**APPENDIX "A"**

For example, a violator is the subject of an outstanding warrant for burglary and criminal trespass. During the pursuit, the violator attempts to ram a pursuing police vehicle. The violator is apprehended during the pursuit, cocaine is found in his vehicle. CC3502 (burglary), CC3503 (criminal trespass, and CS1316 (possession of a controlled substance) would be entered in Block 15 (NONPURSUIT-RELATED CHARGES), CC2702 (aggravated assault) would be entered in Block 19 (PURSUIT-RELATED CHARGES). (The example in the original instructions indicated the drug charges would be considered pursuit-related. This was incorrect.)

NEW FOR 1997 Also include charges exceptionally cleared. For example, if a suspect is killed in the course of the pursuit or other police action related to the pursuit, but otherwise would have been charged with fleeing and eluding, recklessly endangering another person, and aggravated assault, then these charges should be listed in the appropriate blocks.

Block 19, 20 (PURSUIT-RELATED CHARGES)
Charges listed in Block 15 may be listed here also, but only if they are the result of a different incident. For example, aggravated assault is listed in Block 15 because of an outstanding warrant, then the suspect, during the pursuit, rams a pursuing vehicle, resulting in another aggravated assault charge, which would then be listed in Block 20

Blocks 23 through 37
        Enter only whole numbers, in three-digit format

        001     RIGHT
        1.0     WRONG

Blocks 31 through 33 (PROPERTY DAMAGE)
        These amounts must be reported in multiples of $100.

        For example:        005         $500.00
                            050         $5,000.00
                            500         $50,000.00

---

## BY COMMAND OF THE POLICE COMMISSIONER

---