IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYESHA CLARK, *ET AL.* | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 19-1579 |
| DWAYNE MERRELL, *ET AL.* | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                       **FEBRUARY 19, 2025**

The Plaintiffs in this civil rights action are a minor child and her aunt who suffered serious injuries when they were struck by a dirt bike being pursued by a police officer conducting an unauthorized high-speed chase. Plaintiffs Lillie Mae Stubbs ("Stubbs") and minor "Z.C." bring claims under 42 U.S.C. § 1983 against Philadelphia Police Officer Dwayne Merrell ("Merrell") and the City of Philadelphia ("City") asserting that Defendants' conduct in connection with the high-speed pursuit violated Plaintiffs' Fourteenth Amendment substantive due process rights.

Presently before the Court are Merrell's Motion for Summary Judgment (ECF No. 39), the City's Motion for Summary Judgment (ECF No. 40), and Plaintiffs' responses in opposition to Defendants' Motions (ECF Nos. 42, 43). For the following reasons, summary judgment will be denied as to Merrell and granted as to the City.

I.  **BACKGROUND**[1]

    A.    **Factual Background**

The collision that injured Plaintiffs occurred at approximately 1:27 p.m. on Saturday, April 15, 2017, in Upper Darby, Pennsylvania, during a high-speed pursuit of a dirt bike that began in Philadelphia and continued for 8-10 miles at speeds up to at least 60 miles per hour. (Internal Affairs Division ("IAD") Rep., ECF No. 42-1, at 2, 13-14.) That day, Merrell was assigned to the City Police All-Terrain Vehicle ("ATV") detail for the Regional Operations Command South ("ROC South").[2] (Merrell Dep., ECF No. 39, at 62, 64.) The ROC South ATV detail covered the southern part of Philadelphia. (*Id.* at 64.)

The ATV detail was created to protect the public by getting illegal dirt bikes and ATVs off Philadelphia streets.[3] (Ruff Dep., ECF No. 39, at 99.) The ATV detail's primary goal was to locate and confiscate ATVs, not to apprehend the ATV drivers. (*Id.* at 99, 102; Frisco Dep., ECF No. 39, at 86.) Officers assigned to the ATV detail were instructed regarding this goal and

---

[1] Unless otherwise indicated, the factual background is derived from the parties' summary judgment submissions, including the exhibits attached thereto. We view the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
    All record page citations herein refer to ECF system pagination. In addition, we note that the parties have attached non-identical excerpts of certain deposition transcripts. For ease of reference, initial citations to deposition testimony will identify the deponent, ECF document number, and ECF page numbers cited (*e.g.* "Merrell Dep., ECF No. __, at ___"), and subsequent citations will identify the ECF document number and ECF page numbers cited.

[2] At the time, Merrell had been a Philadelphia Police Officer for twenty years and had been a patrol officer assigned to the 16th Police District since 2009. (IAD Rep. at 2.) Merrell was not scheduled to work on April 15, 2017, but he volunteered to work the ATV detail that day as time-and-a-half overtime. (ECF No. 39 at 65.)

[3] In the context of this case, dirt bikes are "off-road motorcycles that are . . . illegal to operate on the streets of Philadelphia." (ECF No. 39 at 63; *see also* Phila. Traffic Code § 12-1133 (defining dirt bikes, ATVs and dune buggies as "off-road vehicles").) For purposes of this Memorandum, we refer to dirt bikes and other off-road vehicles, collectively, as ATVs.

the Police Department's pursuit policy, Directive 9.4, which prohibits vehicular pursuits except in limited exigent circumstances. (IAD Rep. at 7, 11.) Directive 9.4 provides, in pertinent part:

> A. Policy
>
>   1. The primary consideration when participating in or supervising any pursuit is the safety and welfare of the public, other officers, as well as the suspect(s). Every officer and supervisor must always weigh the benefits of immediate capture with the risks inherent to the pursuit itself.
>
> B. Justification for Initiating a Vehicular Pursuit
>
>   1. An officer is justified in initiating a vehicular pursuit only when they are:
>
>     a. In close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or
>
>     b. In close proximity to a suspect vehicle and believes BOTH:
>
>       1) The pursuit is necessary to effect the arrest or prevent escape, AND
>
>       2) The officer has probable cause to believe that the person being pursued has committed or attempted a forcible felony OR, has probable cause to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.
>
>   2. In all other circumstances initiating a vehicular pursuit is strictly prohibited. Accordingly, initiating a pursuit solely for stolen vehicles and traffic violations, including Driving Under the Influence (DUI), is strictly prohibited.

(Directive 9.4 § 1, ECF No. 42-2, at 146.) Among additional detailed pursuit prohibitions and requirements, Directive 9.4 prohibits continuation of an ongoing pursuit outside the boundaries of Philadelphia unless authorized by a supervisor and prohibits initiation of pursuit in any vehicle other than a marked radio patrol car except in exigent circumstances. (*Id.* §§ 3(N)(1), 3(P), at 149, 150.).

On April 15, 2017, the ATV detail was supervised by then-Lieutenant Joseph Ruff ("Ruff") and then-Sergeant Michael Frisco ("Frisco") and was comprised of approximately ten officers, some of whom, including Merrell, were in uniform on marked police off-road motorcycles, while others were in uniform in marked police cars or in plainclothes in unmarked cars. (Ruff Dep., ECF No. 42-1, at 204; ECF No. 39 at 85, 97.) At roll call that morning, Frisco

3

and Ruff reminded Merrell and other ATV detail members that the Department's pursuit policy applied to the detail, gave them copies of the Department directives on pursuits and ATVs, and repeatedly and forcefully emphasized that there would be no pursuits. (IAD Rep. at 7, 11; ECF No. 42-1 at 207; *see also* ECF No. 42-1 at 213 (confirming that "[t]he officers were told that short of witnessing a violent felony taking place, they were not to pursue any vehicle during the detail"). At his deposition, Merrell confirmed that prior to April 15, 2017, he was aware that pursuit of an ATV or a dirt bike could result in injury to either the dirt bike operator or a member of the public. (Merrell Dep., ECF No. 42-1, at 179.) Merrell also acknowledged that at the speeds of his pursuit of the dirt bike in this case, it was likely that any type of accident would result in harm to the dirt bike operator, a third party, or pedestrian. (ECF No. 39 at 74; *see also id.* at 80 (admitting that by engaging in the pursuit at issue in this case, he completely ignored police department policy that existed for the purpose of keeping the public safe.)

On April 15, 2017, Caliph Rashaad Douglass ("Douglass") was operating a green and white dirt bike in West Philadelphia. (Douglass Dep., ECF No. 39, at 27; IAD Rep. at 242.) It is undisputed that the officers who observed Douglass before the pursuit did not see him commit any crime or even traffic violation other than illegally operating the dirt bike on the City streets. (ECF No. 39 at 67, 89.) From there, the record contains differing accounts of how Merrell's pursuit of Douglass began and unfolded. Douglass testified that he was stopped at a stop sign on 53rd Street between Baltimore and Whitby Avenues when he saw a man, now identified as Merrell, wearing black clothing and a black mask sitting on a motorcycle behind him. (*Id.* at 126-27.) According to Douglass, the man said, "don't f**king move" and pointed a gun at his face. (Douglass Dep., ECF No. 43-1, at 156.) Douglass testified that he drove away in fear that

4

Merrell would harm him, and that Merrell then pursued him "relentlessly." (Douglass Dep., ECF No. 42-1, at 221.)

Merrell testified that he was with at least two other ATV detail motorcycle officers when he heard a radio call that another unit was "pursuing" the dirt bike nearby enough that he was "able to intercept the pursuit." (ECF No. 39 at 66-67.) Merrell stated that he saw the dirt bike coming, followed by a police car with lights and sirens on, and he attempted to stop the dirt bike. (*Id.*) He then turned on his lights and sirens and pulled out behind the police car, then drove around the police car in pursuit of the dirt bike. (*Id.* at 67.) When asked later about the pursuit by IAD, Merrell stated that when the information about the dirt bike was relayed, "[w]e headed to the location that they were calling us to. At some point we caught up to it and tried to stop it." (Merrell IAD Stmt., ECF No. 42-1, at 60.) He stated that the "we" referred to a couple of dirt bike officers that were together at the same location. (*Id.*) When asked how long the other dirt bike officers stayed with him, Merrell stated: "They were behind me, I have no idea how long they may have followed along." (*Id.*) When asked at his deposition about the other dirt bike officers he said were with him, Merrell responded: "I believe I thought they were behind me. So I'm not sure what happened to them." (ECF No. 39 at 68.) The record contains no other evidence that other dirt bike officers attempted to stop the dirt bike or were present when the pursuit of it began.

Merrell's account is contradicted by Frisco and Ruff. Frisco testified that he spotted the green and white dirt bike stopped on the side of the road in the area of 55th Street and Chester Avenue at about 1:05 p.m. (ECF No. 39 at 87-88; IAD Rep. at 3.) Frisco then drove past the dirt bike, called for other units, and parked in a spot where he could see the dirt bike if it came northbound, broadcasting the dirt bike's locations until he lost sight of it. (ECF No. 39 at 89;

5

Frisco IAD Stmt., ECF No. 42-1, at 52.)  In his IAD interview, Ruff stated that Frisco and other officers who spotted the dirt bike reported its location but did not follow it. (Ruff IAD Stmt., ECF No. 42-1, at 33.)

When interviewed by IAD, Merrell stated that he started to pursue the dirt bike at 59th Street and Cobbs Creek Parkway. (IAD Rep. at 13.)  At about 1:20 p.m., Merrell began intermittently transmitting his changing location. (*Id.* at 3.)  At 1:23 p.m., Frisco broadcasted the following over police radio: "We're not pursing this dirt bike through the city here.  Let's try to get a last location and try to box him in."[4]  (*Id.* at 4, 20.)  Although Merrell testified that he did not hear Frisco's order not to pursue the dirt bike, a transcript of radio calls during the pursuit reflects that immediately after Frisco's broadcast, Merrell transmitted "Southbound 60 – last seen." (*Id.* at 4.)  Merrell continued to pursue the dirt bike through Cobbs Creek Park, exiting the park near 61st and Chestnut Streets, continuing to 60th and Spruce Streets, then on 60th Street into Upper Darby.

Merrell's pursuit of Douglass reached speeds of at least 50-60 mph. (*Id.*; ECF No. 39 at 69.)  Douglass testified that although the dirt bike he was riding did not have a speedometer, he believed that in one stretch of the pursuit, the speed reached the dirt bike's top speed of 90-95 mph. (ECF No. 39 at 128.)  Douglass further testified that Merrell pursued him "relentlessly," using the same maneuvers he did, including driving through oncoming traffic and weaving in and out of traffic from one side of the street to the other. (ECF No. 42-1 at 101-02.)  A compilation of surveillance camera video obtained by the Upper Darby Police Department

---

[4] Boxing in is a technique for stopping a fleeing vehicle by surrounding the fleeing vehicle with police vehicles. (IAD Rep. at 19.)  This technique is prohibited by Directive 9.4. (Directive 9.4 at 5.)  IAD sustained a violation against Frisco for failing to recognize Merrell's unauthorized pursuit and failing to correct or clarify the broadcasted "box him in" instruction. (IAD Rep. at 19.)

("UDPD") shows Douglass and Merrell conducting these maneuvers.  (UDPD Video, Pls.' Ex. G (on file with the Court).)  Video from a UDPD substation shows Douglass's dirt bike traveling northbound on 69th Street approximately three seconds before it struck Plaintiffs and shows Merrell at the same location traveling northbound approximately 13 seconds behind Douglass.  (IAD Rep. at 5.)  Merrell testified, however, that approximately two blocks before the site where the dirt bike's collision with Plaintiffs would imminently occur, the dirt bike had started to pull away from him and he wasn't sure where he was, so he turned off his sirens, left his lights on and, although continuing in the same direction, he stopped following the dirt bike.  (ECF No. 39 at 72.)  He testified:

> I just backed off.  I just continued to go straight, trying to figure out where I am, noticing a lot of traffic up ahead of me, vehicular traffic.  Tried to slow down.  So I just started working my way through the traffic.  A lot of pedestrians out there.

(*Id.*)

Douglass crashed the dirt bike into Plaintiffs at the intersection of 69th and Ludlow Streets, as Plaintiffs were attempting to cross 69th Street at a designated pedestrian crosswalk.  (IAD Rep. at 2; UDPD Video.)  Immediately after the collision, a group of bystanders gathered in the intersection around Plaintiffs, both of whom were seriously injured and unconscious.[5]  Douglass, who was thrown from the dirt bike, briefly ran northbound on 69th Street, then stole a brown Nissan from a man he encountered at 69th and Market Streets.  (ECF No. 39 at 132; IAD Rep. at 5.)  Approximately 26 seconds after Plaintiffs were hit, Merrell reached the collision scene, where he drove around Plaintiffs and the other the people in the middle of the road and past Douglass's dirt bike, which was on the ground in the middle of 69th Street.  (*Id.*; ECF No.

---

[5] IAD records reflect that Stubbs was transported to Penn Presbyterian Hospital Trauma and listed in critical/stable condition.  The minor, Z.C., was transported to Children's Hospital of Philadelphia and listed in serious condition with internal and head injuries.  (ECF No. 42-1 at 23.)

39 at 79; Merrell IAD Stmt., ECF No. 42-1, at 63.) Merrell, who had ostensibly stopped following the dirt bike, testified that as he was working his way through the traffic—with "[a] lot of pedestrians out there"—he saw the man he had been chasing getting into a vehicle and driving off from 69th Street. (ECF No. 39 at 72.) At that point, Merrell testified, he reactivated his sirens and "went after the vehicle." (*Id.*) Merrell testified at his deposition, and asserted to Frisco, Ruff, and AID, that he did not see the collision, the Plaintiffs on the ground, or the dirt bike in the middle of the road. (*See*, *e.g.*, ECF No. 39 at 75, 77; IAD Rep. at 5, 9, 12-13; Ruff IAD Stmt. at 35-38.) Merrell testified that until he saw the dirt bike rider get into the vehicle, he was just working his way through the heavy traffic. (ECF No. 39 at 75.) A witness interviewed by the UDPD, however, reported that within 30 seconds after the dirt bike struck Plaintiffs, a police officer on a motor bike with lights flashing sped through the scene. (UDPD Interview Rec., ECF No. 42-1, at 128-29.) The witness also stated the officer "drove past the two in the street" and did not stop to check on them. (*Id.*; *see also id.* at 113 (stating that as the dirt bike rider drove off in the stolen car, "[a] cop on a motorcycle sped past after him"), 115 (stating that by the time the stolen car reached the intersection the officer was right behind him).

Merrell briefly pursued Douglass east on Market Street, then ended the pursuit after Douglass abandoned the stolen Nissan at a lot in the 6300 block of Market Street. (IAD Rep. at 5.) Merrell then returned to his patrol duties without notifying his supervisors or the UDPD that he had engaged in two pursuits and witnessed a carjacking. (*Id.* at 5, 16.) When Ruff and Frisco later asked Merrell if he had been involved in a fight or other incident, Merrell denied that he had pursued or initiated a traffic stop of the dirt bike. (*See*, *e.g.*, IAD Rep. at 8, 12, 16, 18.) After the UDPD contacted Merrell's supervisors regarding the pursuit into Upper Darby and resulting accident, Merrell denied seeing the carjacking or pursuing the carjacker, and he prepared and

8

signed City and state pursuit memoranda that contained false or incomplete information, including representations that the dirt bike pursuit lasted for only two minutes and covered eight city blocks and that there were no motor vehicle accidents as a result of the pursuit. (*See e.g.*, Merrell IAD Stmt. at 58-70.) He also omitted from the reports the fact that he engaged in the second pursuit of the stolen Nissan. (*Id.* at 68.)

An IAD investigation concluded that Merrell had: (1) violated Directive 9.4; (2) falsified official documents; (3) committed insubordination; (4) violated Directive 4.1, which requires the first officer on scene to protect the scene, summon necessary assistance, and render first aid to the injured; and (5) provided false statements to a supervisor. (IAD Rep. at 16-18.) The IAD also sustained against Frisco the allegation of Failure to Supervise for his failure to terminate Merrell's pursuit and a violation of Directive 9.4 for broadcasting the statement that ATV detail officers should "try to box [Douglass] in." (*Id.* at 19.) With respect to Ruff, the IAD sustained the allegation of Failure to Supervise for his failure to recognize Merrell's pursuit and to take immediate corrective measures to clarify Frisco's "box him in" broadcast. (*Id.*)

## II.    LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party seeking summary judgment bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If this showing is made, the burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact. . . ."

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show [ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact. . . .Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

When considering a motion for summary judgment, a court "*must* construe all facts and inferences in favor of the nonmoving party." *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015) (emphasis in original); *see also Matsushita*, 475 U.S. at 587-88. "[The court's] role is 'to determine whether there is a genuine issue for trial,' it is 'not . . . to weigh the evidence and determine the truth of the matter.'" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). However, where a genuine dispute exists, the court draws inferences in the non-movant's favor. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) ("The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system."); *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge, whether [the court] is ruling on a motion for summary judgment or for a directed verdict.")

## III. DISCUSSION

Merrell seeks summary judgment based on qualified immunity, contending that the record contains no evidence from which a fact finder could conclude that he acted with intent to harm in the high-speed pursuit at issue here. The City's Motion contends that Plaintiffs have failed to adduce evidence that the City had any unconstitutional policy or custom with respect to high-speed police pursuits or that any of its policymakers were deliberately indifferent to a pattern of constitutional violations by its officers generally, or as to Merrell. We address these issues in turn.

### A. Qualified Immunity

The qualified immunity doctrine is intended to "give[ ] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). When assessing a claim for qualified immunity, we must answer two questions: "One is whether the defendant's conduct violated a statutory or constitutional right. The other is whether the right at issue was clearly established when the conduct took place." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It is within our discretion to choose the order in which to address these questions. *Tolan*, 572 U.S. at 656–57 (citing Pearson, 555 U.S. at 236). With respect to either question, however, we "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

1.  *Clearly Established Right*

"For a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Starnes v. Butler Cty. Court of Common Pleas, 50th Judicial Dist*., 971 F.3d 416, 426 (3d Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts must determine "if the case law at the time of the violation would have put the official on 'fair notice' that his conduct violated the plaintiff's rights.'" *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "In other words, the 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To determine whether a right is clearly established, we first look to applicable Supreme Court precedent. If none exists, then "it may be possible that a 'robust consensus of cases of persuasive authority' in the Courts of Appeals could clearly establish a right for purposes of qualified immunity." *L.R. v. Sch. Dist. of Phila*., 836 F.3d 235, 247-48 (3d Cir. 2016) (citation omitted).

As we noted in our previous opinion in this matter, the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), provides the constitutional framework governing Plaintiffs' substantive due process claim arising from the April 15, 2017 pursuit. In *Lewis*, the Court reiterated that "the touchstone of [substantive] due process is protection of the individual against arbitrary action of the government," including "in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 845 (internal quotations and alterations omitted). The Court further reaffirmed that because "only the most egregious official conduct can be said to arbitrary in the constitutional sense," government action must be "shock[] the conscience" to be actionable as a substantive due process violation. *Id.* at 846 (internal quotations omitted).

12

On the spectrum of culpability required to shock the conscience, situations "demand[ing] an officer's instant judgment," such as a "high-speed automobile chase aimed at apprehending a suspected offender," are at the high end, and "only a purpose to cause harm unrelated to the legitimate object of arrest" will suffice.  *Id*. at 836, 849, 853; *see also Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018) ("The level of culpability required 'to shock the contemporary conscience' falls along a spectrum dictated by the circumstances of each case." (quoting *Lewis*, 523 U.S. at 847-49 & n.8))[6]; *Davis v. Twp. of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999) ("The critical factor in determining whether Fourteenth Amendment liability for a high-speed chase may be imposed is whether the officer's conduct can be found to shock the conscience, for which the evidence must show intent to harm the suspect physically.")  Applying this standard, the Court in *Lewis* held that the officer who conducted a high-speed pursuit was entitled to qualified immunity where he acted pursuant to his "instinct to do his job as a law enforcement officer," not in furtherance of "an improper or malicious motive," such as to "terrorize, [or] cause harm."  *Lewis*, 523 U.S. at 855; *see also Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 301 (D. Md. 2020) (finding that alleged facts and inferences therefrom plausibly alleged a police chase that might shock the conscience under *Lewis*.)

---

[6] As we noted previously, the Third Circuit clarified in *Sauers* that the highest end of the culpability spectrum does not categorically apply to all police pursuits, concluding:
> Police officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law.  That law clearly establishes that the level of culpability required to shock the conscience exists on a spectrum tied to the amount of time a government official has to act. . . . [W]hen there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior, constitutional liability can arise when the officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm.

905 F.3d at 723.  Because Sauers was decided more than a year after the unauthorized pursuit in this case, we do not address whether the conscious disregard standard would otherwise apply to the facts here.

The standard of constitutional liability articulated in *Lewis* was clearly established prior to April 15, 2017, and police officers such as Merrell were on fair notice that they could be subjected to constitutional liability for conducting a high-speed pursuit with a purpose to cause harm unrelated to the legitimate object of arrest.

### 2.   *Substantive Due Process Violation*

In our previous opinion denying Merrell's motion to dismiss, we determined that the facts alleged by Plaintiffs supported a plausible inference that Merrell acted with the culpability required to establish a violation of substantive due process. We now conclude that the record evidence and reasonable inferences therefrom give rise to material issues of fact and credibility that preclude summary judgment in favor of Merrell.

Merrell appears to argue that under *Lewis* and its progeny, and regardless of the circumstances of a particular case, a high-speed police chase can never give rise to substantive due process liability unless the plaintiff produces unequivocal direct evidence of an officer's intent to harm a specific victim.[7] We disagree. As a threshold matter, we note that "[t]here often is no way to establish subjective intent, other than by the reasonable fact finder's common sense evaluation of the circumstances." *Davis v. Twp. of Hillside*, 190 F.3d 167, 174 (3d Cir. 1999)

---

[7] We reject the argument that Plaintiffs are required to prove that Merrell specifically intended to harm them as innocent bystanders. Like Merrell, we are not aware of any authority in this Circuit imposing such a requirement. Moreover, the argument is at odds with *Lewis* and has been rejected by courts in other jurisdictions that have addressed the issue. Significantly, in discussing the constitutional culpability required in the context of a high-speed police chase, the *Lewis* Court specifically noted "the high-speed threat *to all those within stopping range*, be they suspects, *their passengers, other drivers, or bystanders*" posed by police pursuits. 523 U.S. at 853 (emphasis added). If the Court intended to require proof that the culpable conduct was directed at a particular victim, it would have said so explicitly. *See also Est. of Soakai v. City of Oakland,* No. 23-381, 2023 WL 8242121, at *4 (N.D. Cal. Nov. 28, 2023) (concluding that a purpose to harm *anyone* unrelated to the legitimate object of arrest satisfies the element of arbitrary conduct shocking to the conscience for a Fourteenth Amendment claim); *Johnson v. Baltimore Police Dept*, 452 F. Supp. 3d 283, 302 (D. Md. 2020) ("[T]he weight of authority post-*Lewis* holds that the 'intent to harm' standard applies to substantive due process claims arising out of police chases, whether the claim is brought by the target of the chase, or an innocent bystander.").

(McKee, J., concurring). "Indeed, intent, particularly in constitutional cases, often must be inferred from circumstantial evidence." *Id.*; *see also Kedra v. Schroeter*, 876 F.3d 424, 444 (3d Cir. 2017) ("Inferring mental state from circumstantial evidence is among the chief tasks of factfinders.") (citing *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012)); *Metzger By & Through Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988) ("[W]e cannot permit a summary judgment to be granted to a defendant who, by an intentional act, may have caused serious harm simply because he says he did not intend the harm."); *McGowan v. Cnty. of Kern*, No. 15-1365, 2018 WL 2734970, at *7 (E.D. Cal. June 7, 2018) ("Unlike many areas of constitutional law, the purpose to harm standard concerns the subjective state of mind of the defendant.") (citing *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013).

  In our view, a jury considering the evidence in this case could infer that Merrell acted with "a purpose to cause harm unrelated to the legitimate object of arrest." *Lewis*, 523 U.S. at 836. Douglass, the pursued dirt bike rider, testified that the high-speed chase ensued when Merrell pointed a gun at his face and threatened him not to move. The record also includes evidence that Merrell chased Douglass at speeds up to 90-95 mph, driving through oncoming traffic and weaving in and out of traffic from one side of the street to the other, and that he sped and swerved through the collision scene, where the seriously injured Plaintiffs were on the ground and surrounded by bystanders. In addition, it is undisputed that Merrell repeatedly lied to and withheld information from his supervisors and submitted inaccurate reports regarding the pursuit and resulting accident. A jury assessing Merrell's credibility and other evidence in the record could reasonably conclude that he initiated and continue the pursuit with the intent to cause a collision. *McKenna v. Wolk*, No. 18-CV-3746, 2021 WL 6136182, at *6 (E.D. Pa. Dec. 29, 2021) (reasoning that a jury could conclude that officer intentionally swerved his police

vehicle into path of dirt bike with the intent of causing a collision); *see also McGowan*, 2018 WL 2734970, at *8 (noting that a purpose to harm can be implied where a defendant acts with actual knowledge or virtual certainty that his actions will cause harm).

Moreover, we note that under *Lewis*, the required level of culpability in this case is "a purpose to cause harm *unrelated to the legitimate object of arrest*." 523 U.S. at 836 (emphasis added). Thus, the issue of whether a defendant acted with the requisite intent to harm must be evaluated in light of all the circumstances surrounding the defendant's actions, including whether they were related to a "legitimate law enforcement objective." *Lewis*, 523 U.S. at 846. In this case, Merrell's initiation and continuation of the pursuit directly violated Directive 9.4, the explicit orders of his supervisors, and was contrary to the purpose of the ATV detail, which was to confiscate off-road vehicles, **not** apprehend their operators.[8] Until Douglass fled—according to him out of fear that Merrell would harm him—he had not committed any crime beyond the summary offense of operating the dirt bike, and he was not subject to arrest. On the record here, a jury could find that Merrell's actions were unrelated to a legitimate law enforcement purpose and, instead, "were undertaken to 'induce lawlessness . . . or to terrorize, cause harm, or kill.'" *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008) (quoting *Lewis*, 523 U.S. at 855). As Judge McKee's concurrence in *Davis* observed:

> By way of example, I do not think that under *Lewis* police would be justified in firing shots directly at the driver of a fleeing car after initiating pursuit for a minor traffic violation, knowing that the fleeing car was about to reach a dead-end or some barricade that would force the driver to stop. I believe *Lewis* would allow a reasonable fact finder to conclude, based on the circumstances, that the action of the apprehending officers was intended to injure or terrorize the driver, thus permitting a determination that the driver's substantive due process rights had been

---

[8] We acknowledge that violations of policy are insufficient to establish purpose to harm under *Lewis*. *Davis*, 190 F.3d at 170 (citing *Lewis*, 523 U.S. at 838). However, we do not read *Lewis* as rendering such violations wholly irrelevant to the issue of whether a defendant's actions related to a "legitimate law enforcement objective."

16

> violated. Such an intent to harm may be understandable given the dangers of law enforcement, but it also would be intolerable and absolutely collateral to any legitimate law enforcement objective.

*Davis*, 190 F.3d at 174.

Finally, we note that the *Lewis* Court observed, in a footnote, that a cognizable substantive due process violation may arise "when a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle." *Lewis*, 523 U.S. at 854 n.13 (citing *Checki v. Webb*, 785 U.S. 534, 538 (5th Cir. 1986). We have not identified any cases in this Circuit addressing whether particularly egregious intentional misuse of a police vehicle can satisfy the "shocks the conscience" standard of *Lewis* independently or inferentially to establish a purpose to harm. However, courts in other jurisdictions have done so and determined that under appropriate circumstances, intentional misuse of a police vehicle can rise to the level of "conscious shocking" conduct. *See Simmons v. Baltimore City Police Dep't*, No. 21-969, 2021 WL 3418840 (D. Md. Aug. 5, 2021) (denying motion to dismiss where plaintiffs alleged that defendant officers intentionally misused police vehicle by engaging in a pursuit that "was not necessary in its purpose nor in the manner that it was executed"); *McGowan*, 2018 WL 2734970, at *8 ("*Lewis* suggests that a law enforcement officer may violate due process by intentionally misusing their vehicle."). Here, the record contains evidence from which a jury could conclude that Merrell intentionally misused his police vehicle when he initiated and continued a high-speed pursuit that was neither necessary in its purpose nor in the in the manner that it was executed.

    **B.**  **Plaintiffs' *Monell* Claim Does Not Withstand Summary Judgment**

Pursuant to *Monell v. Department of Social Services*, local governmental bodies may be liable under Section 1983 for the unconstitutional conduct of individual defendants if those defendants were executing an official policy or custom of the local government when they

violated a plaintiff's rights.  436 U.S. 658, 690 (1978).  A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers."  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  A custom is "an act 'that has not been formally approved by an appropriate decision maker,' but is 'so widespread as to have the force of law.'"  *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).  In order to recover from a municipality under this theory of liability, a plaintiff must show "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation."  *See City of Canton*, 489 U.S. at 385.  A plaintiff attempting to establish a *Monell* claim must "identify a custom or policy, and specify what exactly that custom or policy was."  *See McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).

   In the alternative, a municipality may be liable under Section 1983 for a failure to train, monitor, or supervise—however, the failure alleged in such a circumstance must amount to "deliberate indifference to the constitutional rights of persons with whom the police come in contact."  *See City of Canton*, 489 U.S. at 388.  To establish deliberate indifference in this context, a plaintiff must generally show the failure alleged "has caused a pattern of violations."  *See Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). Where a failure to train claim is alleged based on a single incident, the complaint must contain allegations that policymakers "kn[e]w to a moral certainty" that the alleged constitutional deprivation would occur and the need for further training "must have been plainly obvious."  *See City of Canton*, 489 U.S. at 390 n.10.  Further, "[l]iability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of

continued injury.'" *See Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1029–30 (3d Cir. 1991)).

Plaintiffs have failed to adduce sufficient evidence to sustain their *Monell* claim. The record contains no evidence that the City had a policy or custom of permitting officers to engage in pursuits. On the contrary, the City had a policy, Directive 9.4, that expressly prohibited pursuits except in limited, exigent circumstances and provided detailed requirements and restrictions in the circumstances that pursuits were allowed. The officers on the ATV detail on April 15, 2017, were provided Directive 9.4 and forcefully reminded of and ordered to comply with the pursuit policy. Plaintiffs likewise have not produced evidence that the City had a custom of allowing pursuits in spite of the Directive 9.4 nor any statistical or other evidence regarding the number or circumstances of other pursuits. Finally, although Plaintiffs' assert a failure to train theory, they have not adduced evidence—beyond the policy and training deficiencies allegedly evident in the single incident at issue here—demonstrating that the City's current training is deficient or identifying any specific training that the City failed to provide. The evidence falls short of the demonstrating the policy, widespread custom, or pattern of violations necessary to sustain a *Monell* claim.

## IV.   CONCLUSION

For the foregoing reasons, Merrell's Motion for Summary Judgment will be denied, and the City's Motion for Summary Judgment will be granted. An appropriate order follows.

                                                **BY THE COURT:**

                                         */s/ R. Barclay Surrick*
                                         **R. BARCLAY SURRICK, J.**